[No. C061808. Third Dist. July 8, 2011.]

CLOVER VALLEY FOUNDATION et al., Plaintiffs and Appellants, v.
CITY OF ROCKLIN et al., Defendants and Respondents;
ROCKLIN 650 VENTURE et al., Real Parties in Interest and Respondents.

TOWN OF LOOMIS, Plaintiff and Appellant, v.
CITY OF ROCKLIN et al., Defendants and Respondents;
ROCKLIN 650 VENTURE et al., Real Parties in Interest and Respondents.

204

## COUNSEL

Kenyon Yeates, Charity Kenyon, Bill Yeates and Christina Morkner Brown for Plaintiffs and Appellants Clover Valley Foundation and Sierra Club.

Law Offices of Donald B. Mooney and Donald B. Mooney for Plaintiff and Appellant Town of Loomis.

Russell A. Hildebrand, City Attorney, for Defendants and Respondents.

Jarvis, Fay, Doporto & Gibson and Rick W. Jarvis for Real Parties in Interest and Respondents.

## OPINION

**NICHOLSON, Acting P. J.—**

### INTRODUCTION

This is a case where CEQA worked.[1] The City of Rocklin (the City) in 2007 approved a residential development project for an undeveloped area of the City known as Clover Valley. The approval culminated more than 10 years of planning and environmental review for the site's development. Since 1981, zoning authorized nearly 1,000 homes for the site. The site's owners applied to develop a project for that size in 1991, and environmental review began in earnest in 1995. As a result of environmental concerns analyzed since then, the approved project is roughly half the size it could have been. The amount of open space has increased by a factor of five. The project owners have already paid millions of dollars to the City to construct needed

---

[1] CEQA is the acronym for the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.).

infrastructure. The approved project has been redesigned to protect numerous environmental resources on the site, particularly prehistoric Native American artifacts.

Plaintiffs Clover Valley Foundation, the Sierra Club, and the Town of Loomis, however, claim the City has still failed to conduct legally sufficient environmental review. They filed separate petitions for writs of mandate challenging the City's project approval, claiming the City failed to comply with CEQA and the state Planning and Zoning Law (Gov. Code, § 65000 et seq.).

The trial court denied their petitions, and plaintiffs now appeal those judgments. Plaintiffs argue the City abused its discretion in violation of CEQA by certifying an environmental impact report (EIR) they assert failed on many fronts. It allegedly failed to describe the sites' cultural resources, consider a sewer pipeline's growth-inducing effects, consider all oak trees that will be removed, protect a listed species, analyze view and traffic impacts, and document an adequate water supply. Plaintiffs also claim the project, by including road construction within a 50-foot buffer zone, is not consistent with the City's general plan.

We disagree with each of plaintiffs' claims and affirm the trial court's judgments. The EIR complies with all of CEQA's procedural demands, and its factual conclusions are supported by substantial evidence. All of the impacts raised by plaintiffs were sufficiently described and adequately mitigated in the EIR. In addition, the City did not abuse its discretion in concluding the project was consistent with the City's general plan.

## FACTS

The project at issue, commonly called the Clover Valley Project, is a residential subdivision proposed for the northern end of Clover Valley, a small, narrow valley located in the City's northeast corner. Presently, this part of Clover Valley is undeveloped. Clover Valley Creek runs through the site from north to south. The area includes grasslands, wooded hillsides, oak woodlands, historic rock walls, and prehistoric cultural and archaeological resources.

As approved by the City, the 622-acre project will create 558 homes, a 5.3-acre neighborhood park, a 5-acre commercial site, a 1-acre site for a future fire station, and related infrastructure and streets. One of those streets would be a new road named Valley View Parkway, a road that had earlier been specified in the City's general plan. The project would preserve 366 acres of open space.

Planning for developing Clover Valley began years ago. Since at least 1981, the site has been zoned for residential development of as many as 974 homes. In 1991, the owners of the site applied to develop 974 homes with only 69.8 acres of open space, and for annexation of the site into the City. In 1995, the City circulated a draft EIR for this project. The City prepared a final EIR in 1996, and certified it in 1997. This EIR was not challenged.

Based upon this EIR, the site was annexed by the City, and the City approved general plan and zoning amendments along with a development agreement to allow the proposed project to proceed. The development agreement, approved in late 1997 and effective January 9, 1998, required the owners to pay $1.5 million to the City for a public recreation facility, which the owners did. The development agreement's initial term was 10 years, but the term would automatically be extended for the period of time any litigation challenging any later project approval was pending.

In 2000, the current owners, real parties in interest, submitted an application to begin subdividing the project site into 47 large lots, and the ultimate subdivision of those lots into as many as 933 lots. The City in 2002 circulated a draft EIR for this proposal, which tiered from the earlier annexation EIR certified in 1997.

During the review of this proposal, real parties in interest repeatedly agreed to reduce the size of the project. In October 2003, they reduced the number of homes to 753. In April 2004, they reduced the number to 710 homes. In August 2004, they reduced the number to 689 homes. They ultimately reduced the number to the 558 ultimately approved by the City. As part of this revision, real parties in interest agreed to increase the amount of open space from 69.9 acres to 366 acres, and to reduce Valley View Parkway from a four-lane road to two lanes.

As part of the revised project, the City and real parties in interest negotiated an amendment to the 1997 development agreement. This amendment extended the agreement's term by 10 years, limited the number of homes that could be built to 558, required real parties in interest to pay the City $1 million towards construction of a new fire station, and committed real parties in interest to transfer certain cultural sites on the land to the United Auburn Indian Community for preservation.

The revised project necessitated general plan and zoning amendments to account for the reduced acreage and number of housing units, the increased acreage of open space, and the other project revisions. Rather than use the 2002 draft EIR for the revised and reduced project, City staff determined to prepare a new draft EIR to analyze the revised project. This draft EIR,

referred to as the recirculated draft EIR (RDEIR), was publicly circulated during the first quarter of 2006.

The RDEIR generated 196 comment letters and 74 sets of oral comments. It took the City 15 months, until June 2007, to prepare responses to all of the comments and to release the final EIR (FEIR).

The June 2007 FEIR included 49 pages of "Master Responses" addressing the primary comments that had been raised. The FEIR also included revisions to the RDEIR text and a mitigation monitoring plan.

Members of the public submitted additional comments to the FEIR. As a result, although not required by CEQA, City staff prepared "Responses to Additional Public Comments" (Additional Responses), dated August 20, 2007. The Additional Responses stated they were intended to be incorporated into the FEIR and were to be read together with the Master Responses.

Prior to the release of the Additional Responses, the City's planning commission on July 30 and 31, 2007, held a public hearing and unanimously recommended that the city council certify the EIR and approve the project.

On August 27 and 28, 2007, the city council held a public hearing on the project. At the close of the hearing, the city council certified the EIR (which included the RDEIR, the FEIR and its Master Responses, and the Additional Responses), adopted CEQA findings, and unanimously approved the project, the necessary general plan and zoning code amendments and subdivision maps, and the negotiated amendment to the development agreement.

Plaintiffs Clover Valley Foundation and the Sierra Club (collectively, the Foundation), and plaintiff Town of Loomis (Loomis) filed separate petitions for writs of mandate challenging the City's approval of the EIR and the project. The parties agreed to consolidate the two petitions and to change venue to Sacramento County Superior Court.

On February 6, 2009, the trial court issued a ruling denying the consolidated petitions. On February 27, 2009, the court entered judgment in favor of the City and real parties in interest.

The Foundation and Loomis appeal from the trial court's judgment.

The Foundation alleges the City violated CEQA by failing to:

1. include in the EIR identifying and descriptive information of cultural resources on the project site;

2. consider a proposed sewer pipeline's growth-inducing impacts;

3. evaluate and mitigate for all of the oak trees that will be removed for the project; and

4. adopt legally enforceable mitigation measures to protect the California black rail, a bird species listed as threatened under the California Endangered Species Act (Fish & G. Code, § 2050 et seq.).

The Foundation also claims the City violated the state Planning and Zoning Law (Gov. Code, § 65000 et seq.) by approving a development project that allegedly was inconsistent with the City's general plan, specifically. the general plan's policy prohibiting development within 50 feet of streambanks.

Loomis alleges the City violated CEQA by failing to:

1. adequately analyze the project's impacts on views from Loomis or to discuss possible mitigation measures to avoid or reduce those visual impacts;

2. adequately analyze the project's impacts to transportation and circulation; and

3. identify a legally adequate long-term water supply for the project.

We address each contention below, providing more detailed factual information relevant to each argument.

DISCUSSION

I

*CEQA Standard of Review*

Before addressing the parties' arguments, we review the standard of review we are to apply in a CEQA appeal. Our Supreme Court recently explained the standard of review as follows:

"In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.' (Pub. Resources Code, § 21168.5.) Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' (§ 21168.5; see *Western States Petroleum Assn. v. Superior Court* [(1995)] 9 Cal.4th [559,] 568 [38 Cal.Rptr.2d 139, 888 P.2d

1268]; *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392–393 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights I*).)

"An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo. [Citations.] We therefore resolve the substantive CEQA issues . . . by independently determining whether the administrative record demonstrates any legal error by the [City] and whether it contains substantial evidence to support the [City's] factual determinations." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426–427 [53 Cal.Rptr.3d 821, 150 P.3d 709], fns. omitted (*Vineyard Area Citizens*).)

"[A]n agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence. ([Pub. Resources Code,] § 21168.5.) Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161]), we accord greater deference to the agency's substantive factual conclusions. In reviewing for substantial evidence, the reviewing court 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument.' (*Laurel Heights I, supra*, 47 Cal.3d at p. 393.)

"In evaluating an EIR for CEQA compliance, then, a reviewing court must adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts. For example, where an agency failed to require an applicant to provide certain information mandated by CEQA and to include that information in its environmental analysis, we held the agency 'failed to proceed in the manner prescribed by CEQA.' (*Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1236 [32 Cal.Rptr.2d 19, 876 P.2d 505]; see also *Santiago County Water Dist. v. County of Orange* [(1981)] 118 Cal.App.3d [818,] 829 [173 Cal.Rptr. 602] [EIR legally inadequate because of lack of water supply and facilities analysis].) In contrast, in a factual dispute over 'whether adverse effects have been mitigated or could be better mitigated' (*Laurel Heights I, supra*, 47 Cal.3d at p. 393), the agency's conclusion would be reviewed only for

substantial evidence. Thus, in *Laurel Heights I*, we rejected as a matter of law the agency's contention that the EIR did not need to evaluate the impacts of the project's foreseeable future uses because there had not yet been a formal decision on those uses (*id.* at pp. 393–399), but upheld as supported by substantial evidence the agency's finding that the project impacts described in the EIR were adequately mitigated (*id.* at pp. 407–408)." (*Vineyard Area Citizens, supra*, 40 Cal.4th at p. 435.)

We proceed to apply these standards to plaintiffs' CEQA allegations.

## II

### *The Foundation's Appeal*

#### A. *Description of cultural resources*

The Foundation claims the EIR failed to properly describe the cultural resources existing on the site and, in particular, eight cultural sites that, despite project redesigns, are in harm's way. It asserts the EIR failed to provide an adequate description of the existing cultural resources and failed to identify any mitigation measures to remedy impacts to the resources. It also faults the City for not providing detailed information about the sites to the State Historic Preservation Officer upon the latter's request.

The Foundation acknowledges the City provided information and proposed mitigation measures regarding the eight affected cultural sites in the City's Additional Responses, but it claims this information came too late. CEQA, the Foundation argues, required this information to be included in the publicly circulated RDEIR, and the City allegedly abused its discretion by failing to comply with this directive.

We disagree with the Foundation's argument. The City's description of the existing cultural resources in all of the documents that comprise the EIR satisfied CEQA's requirement to make a good faith effort at describing the existing conditions, particularly in light of conflicting requirements that prohibited the City from disclosing detailed information about the location and type of cultural resources on the site.

CEQA, federal law, and other state laws uniformly require the City to protect the confidentiality of Native American cultural resources to preserve them from harm. The Foundation's argument, purportedly in the guise of protecting the environment, actually would defeat the confidentiality and expose the resources to possible destruction. This would turn CEQA on its head.

### 1. Additional background information

#### a. RDEIR's description and analysis of cultural sites and proposed mitigation measures

The RDEIR begins its analysis of the project's impacts on cultural resources by providing a 20-page overview of the prehistoric and historic settlement of the Sierra Nevada and the Central Valley, and the archeological and ethnographic studies that have documented that settlement. The discussion emphasizes studies that were performed in areas near the project site. Prehistoric Native American sites and artifacts have been found and are well documented in areas around Rocklin, Newcastle, and Auburn. The discussion also relates the history of the area since Americans of European descent arrived in the 1800's.

Regarding the project site, the RDEIR states record searches and field surveys resulted in locating 34 prehistoric period resources and one historic period resource within the project site. Test excavations at some of these sites encountered Native American remains.

The RDEIR noted that in 2002, the United States Army Corps of Engineers and the State Historic Preservation Officer (SHPO) determined these resources formed an archaeological district eligible for listing on the National Register of Historic Places under the National Historic Preservation Act (16 U.S.C. § 470 et seq.) (NHPA). This determination was based on a study prepared by Peak & Associates referred to as a DOE, an acronym for "A Determination of Eligibility and Effect on Cultural Resources within the Clover Valley Lakes Project Area."

The RDEIR stated that because the Army Corps of Engineers and the SHPO had determined the proposed project could adversely affect the resources in this archaeological district, the Army Corps of Engineers had initiated a process under section 106 of the NHPA to develop a management plan known as a historic properties management plan (HPMP) to mitigate the project's adverse effects on the cultural resources. (The HPMP was submitted to the Army Corps of Engineers and the SHPO for review and approval in July 2007.)

The RDEIR identifies the resources located in the project site by a number on a chart, and for each resource it notes whether the resource contains bedrock mortars, a midden,[2] circular-shaped depressions, human remains,

---

[2] A midden is a dunghill or refuse heap. (Merriam-Webster's Collegiate Dict. (11th ed. 2003) p. 786.)

projectile points, ground stone, lithic tools,[3] and obsidian debitage.[4] The RDEIR does not provide any further identification or description of the resources, such as their location, size, or significance. It does not do so because that information is contained in the proposed HPMP, and that document is confidential and not available for public review in order to protect against vandalism and artifact collecting.

The RDEIR concluded the project could result in a potentially significant impact to these historic and cultural resources. The RDEIR explained: "Although project site design has been revised a number of times to avoid and protect resources, not all of the resources can be avoided through project design. A program of mitigation has been designed to satisfy the federal requirements for this undertaking in the [HPMP] that require[s] approval by the U.S. Army Corps of Engineers and the State Office of Historic Preservation. Due to the sensitive nature of information contained in the [HPMP], the HPMP is not available for public review. Implementation measures for the cultural resources sites include installation of temporary construction fencing to avoid short-term impacts, as well as the use of monitors during construction to ensure that sites are not damaged or disturbed during construction. However, for some cultural sites, data recovery excavations may not occur prior to the initiation of construction; therefore, the proposed project would result in a *potentially significant* impact." (Original boldface & italics.)

To reduce this impact to a less-than-significant level, the RDEIR proposed a number of mitigation measures. Prior to receiving a grading permit, real parties in interest must hire an archaeologist who will assist in providing "cultural resource sensitivity training" to all construction personnel. Real parties in interest must monitor all earthmoving activities, and place construction fencing around cultural resource sites.

Despite project redesigns, eight resource sites could not be protected. The RDEIR required "data recovery excavations" to occur at those sites, as detailed in the confidential HPMP. Project construction was not to commence until the Army Corps of Engineers accepted a preliminary report from the testing done at those sites.

In addition, to protect against vandalism and artifact collecting resulting from additional people living near the resource sites, those sites identified in the HPMP to be preserved are to be permanently fenced prior to the issuance

---

[3] Lithic tools are tools made from stone. (Merriam-Webster's Collegiate Dict., *supra*, at p. 727.)

[4] Debitage is waste material produced in making prehistoric stone implements. (Oxford Dictionaries <http://oxforddictionaries.com/definition/debitage> [as of July 8, 2011].)

of a grading permit to minimize access. Also, monitoring and checking of the sites will occur throughout each year.

If during construction an archeological or historical resource is discovered, all work will immediately stop within 100 feet of the find until Native American representatives and archaeologists can determine whether the resource qualifies for protection and mitigation measures can be recommended and implemented. If human remains are found, all work will be halted until the coroner makes final disposition of the remains.

###### b. *Comments to RDEIR analysis and City's response*

After it circulated the RDEIR for public comment, the City received numerous requests to disclose the location and character of the cultural resources. In the Master Responses included in the FEIR, the City explained its refusal to provide additional identifying information. It feared disclosure would result in vandalism to the resources. It also claimed its refusal was consistent with the NHPA, which required a federal agency not to disclose to the public information about a historical resource's location and character if disclosure would harm the resource. The City in the RDEIR had disclosed the archaeologically important elements of each cultural site within the context of an extensive discussion of the ethnographic context.[5] That description, the City stated, was adequate to meet the disclosure purposes of CEQA while protecting the resources from harm. Personnel with a need to know had access to the DOE and the draft HPMP, which in the federal permit process would be reviewed by the Army Corps of Engineers and the SHPO. The City claimed the federal process was much more stringent than the CEQA process and would develop the best possible preservation and mitigation measures for the cultural sites.

One of the requests for additional information came from the SHPO. Following his review of the RDEIR, the SHPO wrote to the City and requested copies of the DOE and the draft HPMP. The City responded by giving the SHPO a copy of the DOE. The City noted that the SHPO had already received the DOE as part of determining the cultural resources on the site qualified as an archeological district under the NHPA.

The City, however, refused to give the SHPO a copy of the draft HPMP as part of the CEQA review process for the reasons already mentioned. However, the SHPO would obtain a copy of the HPMP as part of its requirement under the NHPA to consult with the Army Corps of Engineers before the

[5] Ethnography is the study and systematic recording of human cultures. (Merriam-Webster's Collegiate Dict., *supra*, at p. 429.)

Army Corps of Engineers grants permits for the project. This consultation would occur after the CEQA process was completed. The City included copies of this correspondence in the FEIR.

### c. Comments to FEIR and City's response in its Additional Responses

Following its release of the FEIR, the City received additional comments criticizing its refusal to disclose the location and character of the cultural sites. The SHPO criticized the RDEIR and the FEIR for not providing an adequate description of the archeological sites and their significance because the DOE and the draft HPMP were not made available to the public. The SHPO claimed that "[w]hile sensitive information such as archeological site records, sacred sites or maps by law should not be made available, a redacted, but complete version of the reports used in the preparation of a [draft EIR] is required to either be circulated or made available."

The SHPO also claimed the RDEIR and the FEIR failed to include any mitigation measures for the project's impacts to the cultural resources. He faulted the City for deferring to mitigation measures that would eventually be developed under the HPMP process as fulfilling the CEQA requirement to include mitigation measures in the EIR.

The Foundation made similar complaints against the FEIR. It also noted the City, in the original draft EIR prepared in 2002, had provided a narrative description of the cultural sites. It argued the City was required to do the same in the RDEIR.

The City responded to these criticisms in its Additional Responses. The City recognized CEQA's demand to make a good faith effort at full disclosure, but noted it was also bound to follow legal requirements that prohibited full disclosure of information concerning cultural resources. CEQA prohibits the disclosure of information about the location of archaeological sites and sacred lands, or any other information subject to disclosure restrictions under the state Public Records Act (Gov. Code, § 6254). (CEQA Guidelines, Cal. Code Regs., tit. 14, § 15120, subd. (d).)[6] The Public Records Act, in turn, does not require disclosure of any records of Native American graves, cemeteries, places, features, and objects in the possession of a local agency. (Gov. Code, § 6254, subd. (r).)

Moreover, as already mentioned, the NHPA authorized federal agencies not to disclose information regarding the location and character of a historic

---

[6] All references to "Guidelines" are to the state CEQA guidelines, the regulations which implement the provisions of CEQA. (Cal. Code Regs., tit. 14, § 15000 et seq.)

resource. The City stated its refusal to disclose more information than it did in the RDEIR was in compliance with the federal law's intent.[7]

The City rejected the Foundation's criticism that it should have provided a narrative description of the cultural resources in the RDEIR instead of providing the information in a summary table. The City argues its use of the summary table was "merely a different way to communicate nearly the same information."

Despite its claim that it had complied with the demands of CEQA regarding disclosure of cultural resources, the City nonetheless provided as part of its Additional Responses more information concerning the eight cultural resource sites the project would impact. The information, depicted in a table called the Clover Valley Cultural Resources Description, Treatment and Management Table, was derived from redacted site descriptions contained in the DOE and the draft HPMP. The City provided the table "as a clarification or explanation and [it] does not represent any new environmental effects."

This table provided more information than the summary table used in the RDEIR. The table named each of the eight affected cultural sites by number, and for each site recited a brief site description, the amount of the site that would be affected by the project, the reason for the effect, and the management and treatment actions planned to mitigate the effect.

For example, for the cultural site designated as No. CVL-7, the table described the site as "Bedrock mortar features. Associated deposit of cultural material. Relatively deep (70 centimeter) deposit of cultural material in the central portion and a much shallower and less dense deposit in the western portion. Three projectile points; two are large. The third point is a Rose Springs Contracting Stem point."

The portion of the resource site area affected by the project equaled 3,082.9 square meters, or roughly three-quarters of an acre. The impact would arise from construction activities, permanent infrastructure, and house pads. To mitigate the impact, the City would require permanent fencing around the site area not directly affected by construction, biannual monitoring, and data recovery excavations. Similar descriptions were made for each of the eight affected sites.

---

[7] The City also stated that the United Auburn Indian Community, with which it was consulting to prepare the HPMP, had "insisted that the City and the Developer take every precaution to maintain the confidentiality of the location and contents of the site. The City's caution is justified as evidenced by the multitude of commentors that have related their discoveries of biological and cultural resources after having trespassed on the developer's private property."

Regarding the claim that the City was wrongfully deferring mitigation until the federal HPMP process was completed, the City in its Additional Responses reminded the Foundation that the RDEIR included a number of mitigation measures to reduce impacts to a less-than-significant level independent of the HPMP process. The City claimed its mitigation regime satisfied the demands of CEQA.

### d. *Trial court's ruling*

At the hearing on the petitions, the trial court ordered the parties to submit supplemental briefing on whether the EIR adequately disclosed information about the cultural sites, the timeliness of the disclosures made in the Additional Responses, and the effect the NHPA section 106 process would have on the project. On the issue of adequacy, the court wondered why the information about the sites contained in the Additional Responses was not also made available for the other cultural sites. On the issue of timing, the court inquired whether CEQA's policy of affording decision makers and the public an opportunity to comment was fulfilled by including the additional information in the Additional Responses prior to the city council's hearing on the project.

After reviewing the additional briefing, the trial court determined the EIR's analysis of cultural resources, contained in the RDEIR, the FEIR, the Master Responses, and the Additional Responses, satisfied CEQA's requirements. The trial court determined the EIR sufficiently identified the characteristics of the cultural resources, identified the adverse impacts the project would cause to those resources, and specified feasible mitigation measures to mitigate those impacts.

Regarding the level of disclosure made in the EIR, the trial court ruled: "In short, the EIR provides sufficiently clear, comprehensible and comprehensive information to permit decisionmakers and members of the public to intelligently assess potential adverse project impacts to cultural resources and the effectiveness of the specified mitigation measures in avoiding or reducing the impacts to insignificance. The omission of details from the DOE and HPMP does not preclude accurate assessment about the cultural significance of the contents of the documented cultural resources, about the risk of damage and destruction posed to the cultural significance of the resource contents by project construction, and about the feasibility of the specified mitigation measures to preserve documented and accidentally discovered cultural resources in place while recovering data from those portions of cultural resources that will be damaged or destroyed by project construction. [The City's] withholding of details from the DOE and HPMP in accordance with CEQA Guideline 15120(d) and NHPA regulations has not impaired the EIR

as an informational document enabling informed public participation in the CEQA review process." (Fn. omitted.)

Before us, the Foundation claims the trial court erred. It asserts the City prejudicially abused its discretion when it refused to provide in the RDEIR redacted versions of the DOE and HPMP to describe the cultural sites and proposed mitigation measures for each. Omitting this information, the Foundation argues, subverted CEQA's public review purpose.

2. *Analysis*

We must determine whether the EIR contains a sufficient description of the historical and cultural resources existing on the project site. "An EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time . . . environmental analysis is commenced, from both a local and regional perspective. This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant. The description of the environmental setting shall be no longer than is necessary to an understanding of the significant effects of the proposed project and its alternatives." (Guidelines, § 15125, subd. (a).)

■ "Guidelines section 15151 requires an EIR to be prepared 'with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. . . . [T]he sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. . . . The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure.' (See also *San Francisco Ecology Center v. City and County of San Francisco* (1975) 48 Cal.App.3d 584, 594 [122 Cal.Rptr. 100].)" (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 954 [91 Cal.Rptr.2d 66].)

"If the description of the environmental setting of the project site and surrounding area is inaccurate, incomplete or misleading, the EIR does not comply with CEQA. (*San Joaquin Raptor[/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713,] 729 [32 Cal.Rptr.2d 704].) 'Without accurate and complete information pertaining to the setting of the project and surrounding uses, it cannot be found that the [EIR] adequately investigated and discussed the environmental impacts of the development project.' (*Ibid.*)" (*Cadiz Land Co. v. Rail Cycle* (2000) 83 Cal.App.4th 74, 87 [99 Cal.Rptr.2d 378].)

This case presents a paradoxical twist on the issue of good faith effort at full disclosure, as CEQA and the Public Records Act actually *restrict* the

amount of information regarding cultural resources that can be disclosed in an EIR. The Guidelines prohibit an EIR from including "information about the location of archaeological sites and sacred lands, or any other information that is subject to the disclosure restrictions of Section 6254 of the Government Code [(part of the Public Records Act)]." (Guidelines, § 15120, subd. (d).) In turn, Government Code section 6254 of the Public Records Act lists as exempt from public disclosure any records "of Native American graves, cemeteries, and sacred places and records of Native American places, features, and objects described in Sections 5097.9 and 5097.993 of the Public Resources Code maintained by, or in the possession of, the Native American Heritage Commission, another state agency, or a local agency." (Gov. Code, § 6254, subd. (r).)

Public Resources Code sections 5097.9 and 5097.993 list the Native American places, features, and objects, the records of which are not to be publicly disclosed under the Public Records Act: "any Native American sanctified cemetery, place of worship, religious or ceremonial site, or sacred shrine located on public property" (§ 5097.9) and any "Native American historic, cultural, or sacred site, that is listed or may be eligible for listing in the California Register of Historic Resources . . . , including any historic or prehistoric ruins, any burial ground, any archaeological or historic site, any inscriptions made by Native Americans at such a site, any archaeological or historic Native American rock art, or any archaeological or historic feature of a Native American historic, cultural, or sacred site . . . ." (§ 5097.993, subd. (a)(1).)[8,9]

These Guidelines and statutes prohibited the City from disclosing records and information concerning the project site's archeological resources in the EIR, including the records demanded by the SHPO. The archaeological resources, comprising as they do an archaeological district eligible for listing on the National Register of Historic Places under the NHPA, are Native American objects, the records of which in the City's possession are not subject to disclosure under the Public Records Act. Thus, information about

---

[8] The Public Records Act also includes a separate statute, Government Code section 6254.10, which prohibits disclosure of archaeological records. That provision reads: "Nothing in [the Public Records Act] requires disclosure of records that relate to archaeological site information and reports maintained by, or in the possession of . . . a local agency, including the records that the agency obtains through a consultation process between a California Native American tribe and a state or local agency."

[9] As a model, the City also relied upon the authority granted to federal agencies under the NHPA to "withhold from disclosure to the public, information about the location, character, or ownership of a historic resource if the Secretary [of the Interior] and the agency determine that disclosure may . . . [¶] . . . [¶] . . . risk harm to the historic resources . . . ." (16 U.S.C. § 470w-3(a).)

those objects contained in those records, including the DOE and the draft HPMP, are to be excluded under Guidelines section 15120 from publication in the EIR.[10]

In an effort to make full disclosure of the existing physical conditions while also trying to comply with the prohibitions on disclosing information on archeological resources, the City in the RDEIR provided a chart noting the types of archaeological resources and recommended mitigation measures to mitigate impacts to those resources. In the Additional Comments, the City provided more detailed information of the resources that could not be protected and recommended specific mitigation measures for each. In this effort, the City provided more information about the cultural sites than CEQA required.

CEQA's exclusion of archaeological site information from an EIR reflects the state's strong policy in protecting Native American artifacts. Indeed, state law now requires a city or county prior to amending a general plan to consult with affected Native American tribes to preserve or mitigate impacts to Native American artifacts that are located within the city or county's jurisdiction. (Gov. Code, § 65352.3, subd. (a)(1).) As part of that process, the city or county must, consistent with guidelines developed by the Governor's Office of Planning and Research, "protect the confidentiality of information concerning the specific identity, location, character, and use of those places, features, and objects." (Gov. Code, § 65352.3, subd. (b).)

The Governor's Office of Planning and Research guidelines, in turn, counsel local governments to "avoid including any specific cultural place information within CEQA documents (such as Environmental Impact Reports, Negative Declaration, and Mitigated Negative Declarations) or staff reports which are required to be available at a public hearing. In such cases, confidential cultural resource inventories or reports generated for environmental documents should be maintained under separate cover and shall not be available to the public." (Governor's Office of Planning & Research, Cal. Tribal Consultation Guidelines, General Plan Guidelines (Nov. 14, 2005 supp.) p. 27.)

---

[10] At oral argument, the Foundation for the first time argued the lists of Native American objects contained in Public Resources Code sections 5097.9 and 5097.993 do not apply to limit disclosure of archeological resources under CEQA. The Foundation bases this argument on the following sentence from Public Resources Code section 5097.9: "The provisions of this chapter shall not be construed to limit the requirements of the Environmental Quality Act of 1970 [(CEQA)]." The Foundation misapplies this sentence. Public Resources Code sections 5097.9 and 5097.993 are not being construed to limit CEQA's requirements. Rather, CEQA, in the form of Guidelines section 15120, simply incorporates the objects listed in Public Resources Code sections 5097.9 and 5097.993 into *its* list of objects, the information of which need not be disclosed in an EIR. It is CEQA that is limiting CEQA, not the chapter in which Public Resources Code sections 5097.9 and 5097.993 are codified.

Working within these specific restrictions, the City provided sufficient information in the EIR to satisfy CEQA's general demand for full disclosure of the environmental setting. As the trial court correctly found, the EIR provides sufficient information to permit decision makers and members of the public generally to assess the existence of confidential archaeological resources on the site, the potential adverse impacts the project would impose on those resources, and the effectiveness of the specified mitigation measures in · avoiding or reducing those impacts to a level of insignificance.

The Foundation claims the lack of detailed information in the EIR about the archaeological resources precluded meaningful opportunity to comment on the project's effects on those resources. We disagree. The public knew that of the 34 archaeological resources found on the site, all but eight would be fully protected due to the project's redesign. Of the remaining eight, the public knew they would be subject to highly regulated and observed data excavations. CEQA did not require the public to know, at the risk of vandalism and destruction of the resources, the exact nature and location of the resources being protected.

Indisputably, the City complied with the requirements of CEQA. Consequently, there is no prejudicial error. The City made a remarkably good faith effort at full disclosure of the existence of archaeological resources on the site, but did so in recognition of, and submission to, express prohibitions in CEQA not to disclose information regarding the location, use and character of the resources.

At oral argument, counsel for the Foundation reluctantly agreed that the Foundation was not primarily concerned with the sufficiency of the information the EIR eventually provided on the eight affected archeological sites. Indeed, responding to questioning from the panel, counsel agreed the Foundation would not be before the court on this issue had the information provided in the Additional Responses about the eight sites been included in the RDEIR.

Instead, counsel stated the Foundation's real CEQA concern was that the information included in the Additional Responses was not first included in the RDEIR, thereby depriving the public of an opportunity to comment on the information as part of the RDEIR's public review. The difficulty with this argument, however, is that CEQA provides the remedy of recirculation to address a deficient draft EIR, and the information added to the Additional Responses did not trigger an obligation to recirculate the RDEIR. Thus, CEQA provides no remedy for the fault in the RDEIR alleged by the Foundation.

■ Once a draft EIR has been circulated for public review, CEQA does not require any additional public review of the document before the lead agency may certify the EIR except in circumstances requiring recirculation. A lead agency must recirculate an EIR when "significant new information" is added to an EIR after the draft EIR has been circulated for public review. (Pub. Resources Code, § 21092.1; Guidelines, § 15088.5, subd. (a).) New information added to an EIR is not "significant" unless "the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect (including a feasible project alternative) that the project's proponents have declined to implement." (Guidelines, § 15088.5, subd. (a).)

■ "Significant new information" includes, for example, a disclosure that (1) a new significant environmental impact would result from the project or a new mitigation measure; (2) a substantial increase in the severity of an environmental impact would result unless mitigation measures are adopted; (3) a feasible alternative or mitigation measure considerably different from others previously analyzed would clearly lessen the project's significant impacts but the project's proponents decline to adopt it; or (4) the draft EIR "was so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded. (Mountain Lion Coalition v. Fish & Game Com. (1989) 214 Cal.App.3d 1043 [263 Cal.Rptr. 104].)" (Guidelines, § 15088.5, subd. (a).)

"Recirculation is not required where the new information added to the EIR merely clarifies or amplifies or makes insignificant modifications in an adequate EIR." (Guidelines, § 15088.5, subd. (b).)

The City effectively concluded the information added to the Additional Responses about the eight cultural sites did not constitute "significant information," and it did not recirculate the EIR. As did the trial court, we apply the substantial evidence test to the City's determination. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1135 [26 Cal.Rptr.2d 231, 864 P.2d 502] (*Laurel Heights II*).)

We agree with the trial court's finding that substantial evidence supported the determination not to recirculate the RDEIR: "Notably, the additional information released by [the City] about the eight cultural resources requiring data recovery excavation adds narrative detail about the resources' characteristics but not new substantive information which would militate against the resources' cultural significance and need for preservation." (Fn. omitted.) "The information . . . did not require recirculation of the EIR for public comment pursuant to Public Resources Code section 21166 [(regarding

changes necessitating a subsequent or supplemental EIR)] and CEQA Guidelines 15088.5 [(regarding recirculating a draft EIR)]. The additional information about the eight cultural resources merely clarified or amplified information in the EIR."

Because recirculation was not required, we have no opportunity or obligation under CEQA to review the adequacy of the RDEIR divorced from the other documents that comprise the EIR, including the FEIR and the Additional Responses.

The Foundation argues recirculation is not the only remedy for addressing a defective draft EIR. It claims we can invalidate the certification of the entire EIR based on the alleged defective nature of the RDEIR. It cites *Mountain Lion Coalition v. Fish & Game Com., supra,* 214 Cal.App.3d 1043 (*Mountain Lion Coalition*), as the basis for such authority. *Mountain Lion Coalition,* however, is inapposite.

That case concerned the state Fish and Game Commission's failure to prepare an adequate second draft EIR in compliance with a prior court order that had invalidated the first environmental document. The Court of Appeal sustained the trial court's exercise of its continuing jurisdiction over the matter and the grant of a writ of mandate against the second draft EIR because the new draft failed to comply with the trial court's earlier order. (*Mountain Lion Coalition, supra,* 214 Cal.App.3d at pp. 1051, 1052.) The commission abused its discretion by not strictly following the prior order. (*Id.* at p. 1052.) Thus, the remedy exercised by the court in the case is limited to its unique factual situation of enforcing a prior court order.

Moreover, any precedential value of *Mountain Lion Coalition,* as noted above, has been codified at Guidelines section 15088.5. Citing to the case, the Guideline requires recirculation of an EIR if the "draft EIR was so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded." (Guidelines, § 15088.5, subd. (a)(4).)

■ The City and the trial court determined the RDEIR's analysis of the cultural resources was not so deficient, and substantial evidence supports that determination. Because the RDEIR did not qualify for recirculation, and the entire EIR satisfied CEQA's disclosure requirements for cultural resources, the demands of CEQA are satisfied, and we do not, and cannot, take any action against the RDEIR.

B. *Sewer pipeline's growth-inducing impacts*

The Foundation claims the EIR failed to analyze the growth-inducing impacts that construction of an offsite sewer pipeline to serve the project's

558 homes and an additional 524 homes would create. We disagree. The EIR explained the pipeline's growth-inducing impact, that it would remove an obstacle to future growth. No further analysis was required, as that growth had already been expressly contemplated in the City's general plan and the general plan EIR.

1. *Additional background information*

a. *EIR's analysis of pipeline's growth-inducing impacts*

The project includes construction of an offsite sewer line that will accommodate not only this project, but also the eventual additional development of 501 dwelling units to the north of the project site and 23 units to the south. The City claims its zoning already provides for this additional development in these locations, and the upgrade in the sewer infrastructure is required by the South Placer Municipal Utility District (SPMUD) master plan's requirements for providing sewer to the project and the additional development.

The RDEIR acknowledged the proposed sewer infrastructure would generate a growth-inducing impact. It stated that because the SPMUD master plan included the additional development north of the project site, the project's infrastructure was designed to meet the needs of the project and this additional approved development. The RDEIR recognized, however, that any development outside the project site would be required to undergo discretionary approval by the City, including annexation and subdivision map approval.

The Foundation accused the RDEIR of omitting details about the sewer line's growth-inducing effects. It alleged the RDEIR failed to adequately analyze the significance of the growth-inducing impact and it wrongly deferred mitigating the impact. It claimed the EIR had to evaluate the growth-inducing impacts of the sewer line, determine the significance of the growth-inducing impacts, and, if the impacts are significant, identify and discuss feasible mitigation measures.

The City responded to the Foundation's criticisms in its Master Responses. The City acknowledged the project's development of the additional sewer capacity would eliminate "an obstacle to development of these units, and, to that degree, could be considered 'growth-inducing.'" However, the City disagreed with the Foundation's claim that CEQA required the RDEIR to analyze the environmental impacts of the additional development, which may or may not ever occur. The City claimed it was sufficient under CEQA for the EIR to acknowledge the project is removing an obstacle to such future growth.

The City also stated there was a distinction between inducing new growth and merely accommodating growth for which the City has already planned:

"The City's General Plan already designates the areas in question outside the project for the 501 additional units to the north and the 23 units to the south. The City's long-term plans thus already call for the eventual development of these sites, and the City has already certified an EIR for its General Plan analyzing, at a programmatic level, the environmental impacts of such future development. A project's growth inducing impacts can be a problem where a project is inducing growth to occur which is not already planned for [*sic*]. The present project does not raise this problem. In fact, the City is requiring the present project to size the sewer pipes to accommodate this additional growth in order to be consistent with the South Placer Municpal [*sic*] Utility District's long-term infrastructure Master Plan. The project's growth 'inducing' (or, rather, 'accommodating') impacts thus do not constitute a significant adverse environmental impact."

### b. *Trial court's ruling*

The trial court held the EIR's discussion of growth-inducing impacts satisfied CEQA's requirements. The EIR acknowledged the pipeline was growth inducing insofar as it removed an obstacle to residential development already contemplated by the City's general plan and SPMUD's master plan. The EIR did not need to analyze the environmental impacts of that growth because the general plan EIR had already done so at a programmatic level, the growth was not part of the project being approved, and the growth will undergo separate CEQA review when it is begun.

Before us, the Foundation claims the City misstated the law, and, as a result, failed to describe adequately the project's growth-inducing impacts and to evaluate the environmental effects of the foreseeable offsite development.

### 2. *Analysis*

CEQA requires an EIR to "include a detailed statement setting forth . . . [¶] . . . [¶] . . . [t]he growth-inducing impact of the proposed project." (Pub. Resources Code, § 21100, subd. (b)(5).) Section 15126.2, subdivision (d), of the Guidelines explains this requirement obligates an EIR to "[d]iscuss the ways in which the proposed project could foster economic or population growth, or the construction of additional housing, either directly or indirectly, in the surrounding environment. Included in this are projects which would remove obstacles to population growth (a major expansion of a waste water treatment plant might, for example, allow for more construction in service areas). Increases in the population may tax existing community service facilities, requiring construction of new facilities that could cause significant environmental effects. Also discuss the characteristic of some projects which

may encourage and facilitate other activities that could significantly affect the environment, either individually or cumulatively. It must not be assumed that growth in any area is necessarily beneficial, detrimental, or of little significance to the environment."

The EIR's discussion of the sewer line's growth-inducing impacts satisfied this requirement. The RDEIR and the Master Comments explained the sewer improvements would provide part of the infrastructure required later to undertake construction of additional housing to the north and south of the project, thereby removing, euphemistically speaking, "an obstacle to development": the present lack of sufficient sewer capacity. The additional development would indeed tax existing sewage capacity, so this project would alleviate that problem.

■ No further detail or analysis was required of the potential impacts the additional planned development could cause. An EIR is not "required to make a detailed analysis of the impacts of a project on housing and growth. Nothing in the Guidelines, or in the cases, requires more than a general analysis of projected growth. The detail required in any particular case necessarily depends on a multitude of factors, including, but not limited to, the nature of the project, the directness or indirectness of the contemplated impact and the ability to forecast the actual effects the project will have on the physical environment. In addition, it is relevant, although by no means determinative, that future effects will themselves require analysis under CEQA." (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 369 [110 Cal.Rptr.2d 579].)

Here, more detail was not required for at least three reasons. First, the purpose and nature of this project was not to facilitate additional development after the project is completed. In *City of Antioch v. City Council* (1986) 187 Cal.App.3d 1325 [232 Cal.Rptr. 507], a case relied upon by the Foundation, the court struck down the use of a negative declaration to conclude construction of a proposed road and utility infrastructure through undeveloped land would not have a significant effect on the environment. The court found the city needed to prepare an EIR and analyze the impacts of future development that would utilize the improvements where "the sole reason to construct the road and sewer project is to provide a catalyst for further development in the immediate area." (*Id.* at p. 1337.)

Here, the sole reason for constructing the sewer pipeline is not to provide a catalyst for further development. Rather, it is first to meet the needs of the current project. And the nature of the project is not to facilitate additional development.

Second, the contemplated impact on growth is indirect. Although the sewer line will provide essential capacity for the additional housing, it removes only one of potentially numerous obstacles and approval requirements for developing the additional housing that may arise if and when an application to develop it is ever submitted.

Third, any future effects of that additional development will undergo CEQA analysis. In fact, in this case, that growth has already been analyzed in the City's general plan EIR and was contemplated in the general plan and the SPMUD master plan. The possible development's general impacts had already been considered and approved on a program level. CEQA did not require the City to redo that analysis in this project EIR as part of the growth-inducing impacts analysis. (Pub. Resources Code, § 21094, subd. (a).)

The Foundation claims there is no evidence in the record that the general plan EIR actually considered the impacts from the proposed additional housing, and thus the City cannot rely upon it. It faults the City for attempting to rely on the general plan EIR without complying with CEQA's procedures for tiering from another EIR or for incorporating by reference a portion of another EIR. (See Guidelines, § 15152, subds. (a), (g).) The Foundation admits the general plan EIR was mentioned in the City's Master Responses and listed in the references section of the RDEIR, but that allegedly was not good enough. Also, the general plan EIR itself is not included in the administrative record.

A reasonable person would have understood the City was incorporating analysis from its general plan EIR and the SPMUD master plan when it referenced the reader to those documents and stated those analyses had already evaluated the environmental impacts of the additional growth. The opinions of the staff expressed in the FEIR are evidence the general plan EIR includes the analysis, and we are required to presume that EIR is valid. (*River Valley Preservation Project v. Metropolitan Transit Development Bd.* (1995) 37 Cal.App.4th 154, 178 [43 Cal.Rptr.2d 501].) The EIR's discussion thus referenced the reader to the additional information.

For all of these reasons, CEQA required nothing more in this EIR concerning growth-inducing impacts than what is already contained in the document. The EIR informed decision makers and the public about the pipeline's growth-inducing effects and referenced where those impacts were reviewed in more detail. That was enough.

C. *Oak tree removal*

The Foundation claims the EIR fails to account for all of the oak trees that will be removed due to the project. To the contrary, the EIR disclosed the loss

of all oak trees that would be affected by the project and determined the impact was significant and unavoidable. The EIR satisfied CEQA's requirements.

### 1. *Additional background information*

#### a. *EIR's analysis of project's impact on oak trees*

The RDEIR states oak woodland covers approximately 185 acres, or 29 percent, of the project area. The woodland provides a number of important wildlife resources, including food, shelter, roosting, and breeding sites. An inventory counted 28,246 trees on the project site. Development of the project would result in the loss of 7,422 trees. Construction of the major roadways would remove 1,632 trees, and construction of minor streets and small lots would remove 5,790 trees. According to the RDEIR, these calculations of trees to be lost do not include any trees that would be removed from commercial areas.

The City regulates oak tree removal pursuant to general plan polices, its oak tree preservation ordinance, and, in this instance, by the terms of the development agreement between the City and real parties in interest. The general plan, in policy 4 of the plan's open space, conservation and recreation element, states it is the City's policy to "encourage the protection of oak trees, including heritage oaks, and other significant vegetation from destruction."

The oak tree preservation ordinance implements this policy by requiring a permit for the removal of an oak tree that has a trunk diameter at breast height of six inches or more. Mitigation is required and can be made either by tree replacement or payment into the City's oak tree preservation fund.

The development agreement between the City and real parties in interest also addressed oak tree removal. The agreement requires real parties in interest to grant to the City open space and conservation easements for an oak tree preserve and an open space trail system. The agreement also requires real parties in interest to construct a bicycle/pedestrian trail system. In exchange for real parties in interest fulfilling these obligations, the City would deem the preserve and trail system as full mitigation for oak tree removal under the oak tree preservation ordinance so long as the number of oak trees removed does not exceed 25 percent of the oak trees in the project.

The development agreement also stated that trees removed for constructing the major roadways, estimated at 1,632 trees, would not count towards the 25 percent cap. Excluding those trees from the total estimated number of trees to

be lost, 7,422, results in a loss of 5,790 trees, or about 20.5 percent of the total number of trees on the project site, well within the 25 percent cap.

Also, the RDEIR states trees in the proposed commercial areas were not included in the final calculations for tree removal because the oak tree preservation ordinance does not apply to commercial lands.

The RDEIR stated that despite the mitigation required by the development agreement, that agreement did not address removal of trees located within the major roadways associated with the offsite sewer pipeline. Thus, "the loss of trees resulting from the ultimate anticipated development of the project and associated infrastructure would be considered to be a *significant* effect." (Original boldface & italics.) To mitigate that effect, the RDEIR recommended that the City enforce the mitigation measures agreed to in the development agreement, and that real parties in interest develop an oak tree mitigation strategy for impacts to oak trees along the offsite sewer line. The strategy had to be reviewed and approved by the City pursuant to the oak tree preservation ordinance prior to recording a final subdivision map. Even with this mitigation, however, the impact remained significant and unavoidable.

The City received a number of comments on the RDEIR questioning its analysis of trees to be removed by construction of the major roadways as well as the adequacy of the development agreement to mitigate impacts. In its Master Responses, the City responded to the comments by clarifying that oak trees removed for construction of three major roadways through the project would not be counted as trees removed by real parties in interest for purposes of the development agreement.

Rather, mitigation for the loss of those trees would be applied pursuant to policy 4 of the general plan's open space, conservation and recreation element. The general plan EIR, adopted in 1991, had found that impacts on biological resources from constructing roadways where none had existed were significant and unavoidable. In response, the City adopted policy 4. It then implemented that policy through the oak tree preservation ordinance, and through the planning review and land use entitlement process requiring tree replacement and open space preservation.

The City stated mitigation for oak tree loss from construction of general plan roadways throughout the City is accomplished "at a Citywide level" by implementing policy 4. It said mitigating the loss of trees from the project's major roadways, which the City did not count as losses caused by the project, would similarly be accomplished by implementation of policy 4.

After receiving still additional criticisms, the City in its Additional Responses further clarified its analysis of the potential loss of oak trees. The

City concluded the impacts to oak trees lost from construction of the major roadways in the project "will be significant and unavoidable," notwithstanding implementation of mitigation measures pursuant to the general plan policy. In contrast, the City found that impacts to oak trees from development of the project, other than for trees lost from constructing the major roadways, would be mitigated to less than significant through implementation of the development agreement conditions and the requirements of the oak tree preservation ordinance.

The City corrected the RDEIR to read that the development agreement did not address removal of trees located within the major roadways or associated with the offsite sewer alignment. Thus, the loss of trees from ultimate development of the project would be a significant impact.

In its CEQA findings made upon approving the project, the City stated impacts "related to loss of oak trees on the project site due to project implementation" had not been mitigated to a less-than-significant level and were therefore significant and unavoidable impacts.

### b. *Trial court's ruling*

The trial court determined the EIR's analysis of project impacts on oak trees satisfied the requirements of CEQA. Regarding oak trees to be removed for construction of the major roadways, the court stated the EIR properly analyzed and mitigated those impacts by relying on the general plan policy and concluding the loss of these trees was significant and unavoidable.

The court also determined the EIR had, in fact, analyzed the loss of trees on proposed commercial lots. Contradicting the statement in the EIR that oak trees to be removed from commercial lots were not considered, the tree inventory report states the 5,790 trees to be removed for purposes other than construction of the major roadways were "located within the planned residential, commercial and easement areas." In light of this evidence, the trial court concluded the statement in the EIR was erroneous and that oak trees to be removed from commercial areas were in fact considered in the EIR.

The Foundation asserts the City violated CEQA by excluding from the RDEIR any analysis of the 1,632 oak trees to be lost due to construction of the major roadways. It also faults the City's response in the Master Responses that these oak trees would be addressed under the City's general plan policy and oak tree preservation ordinance. It claims this discussion does not satisfy CEQA because, among other reasons, the general plan policy is not specific to loss of trees caused by construction of roadways, the City's CEQA

findings do not reference these policies as a mitigation measure, the master findings do not comply with CEQA procedures regarding reference to other EIR's, and the general plan EIR is not included in the record and we thus cannot determine whether it in fact addressed the loss of oak trees due to construction of major roads in the City.

The Foundation also claims the City violated CEQA by excluding from analysis the loss of oak trees from the project's commercial areas. It asserts the trial court's conclusion that these oak trees were in fact included in the analysis is not supported by evidence.

### 2. *Analysis*

■ An EIR, when looked at as a whole, must provide a reasonable, good faith disclosure and analysis of the project's environmental impacts. (*Laurel Heights Improvement Assn. v. Regents of University of California, supra*, 47 Cal.3d at p. 392.) This EIR's analysis of the project's impacts on oak trees satisfied this standard.

The EIR disclosed 1,632 oak trees would be lost to construction of major roadways. It determined this impact was significant. Mitigation for these impacts was outside the scope of the development agreement and was to be evaluated and mitigated on a citywide level pursuant to the general plan policy and the City's oak tree preservation ordinance, but even so, the impact remained significant and unavoidable.

The EIR's analysis provided decision makers and the public with a sufficient degree of information on which they could determine whether to approve the project in light of the project's unavoidable environmental impacts. If the project was to be built, oak trees would be lost due to road construction. Mitigation was limited to what the City could enforce through its oak tree preservation ordinance, but that mitigation would not render the impact insignificant. On this point, the EIR did not need to be more specific than it already was.

The Foundation's other arguments also do not fare well. The Foundation claims the EIR violated CEQA by relying on the general plan policy and the general plan EIR without incorporating any discussion in those documents by reference, without summarizing any portion that was incorporated, or without including a copy of the general plan EIR in the record. However, the EIR clearly quoted the general plan policy and summarized portions of the general plan EIR for use in this EIR. In addition, the EIR itself is substantial evidence of what is said in the general plan and general plan EIR. This discussion was sufficient to enable the decision makers and the public to render an environmentally informed judgment on the project.

We also reject the Foundation's attack on the trial court's factual finding that the EIR analysis included the impacts to trees on lands designated for commercial uses. Substantial evidence supports the trial court's resolution of the conflict between the tree inventory report and the EIR. The EIR discussion was based on the inventory report, and the latter indicates trees on commercial land were considered. That is sufficient evidence to pass CEQA muster.

## D. *California black rail*

The Foundation asserts the City failed to adopt a legally enforceable mitigation measure to protect against impacts to the California black rail, a protected bird species. The Foundation argues the mitigation measure that was adopted wrongfully defers mitigation, and it also imposes a permit requirement that does not exist in law.

We conclude the EIR's analysis of the project's impacts on the black rail complied with CEQA. The EIR proposed mitigation measures that are legally enforceable and do not unlawfully defer mitigation.

### 1. *Additional background information*

#### a. *EIR's analysis of effect on black rails*

The RDEIR describes the black rail's status. The bird is listed under the California Endangered Species Act (Fish & G. Code, § 2050 et seq.) as a threatened species. The Legislature has also designated the black rail as a "fully protected bird." (Fish & G. Code, § 3511.) Birds designated as "fully protected" may not be taken (killed) or possessed at any time, and no state law may be construed to authorize the issuance of licenses or permits to take such birds. (Fish & G. Code, § 3511.)

The RDEIR discloses that the marshes on the project site are a potentially suitable habitat for the black rail. However, at the time of the RDEIR's preparation, no black rails had been observed on the site.

The RDEIR determined the project could create a potentially significant impact to freshwater marsh-occupying birds such as the black rail. Although no permanent impacts were expected due to the incorporation of a buffer around the marshes, temporary impacts could occur due to "culvert/outfall installation," as well as construction of the offsite sewer line.

To mitigate these impacts to a less-than-significant level, the RDEIR recommended, as mitigation measure 4.8MM-13, that real parties in interest

conduct bird surveys within 30 days of performing any ground-disturbing activities. If no birds were identified, no further mitigation would be required. If a nonlisted species was identified, construction activities would be scheduled to occur outside of the breeding season and/or individual birds would be relocated away from the impact area according to applicable governmental protocols. Monitoring of construction would be conducted by a qualified biologist and reported to the appropriate agency.

If a listed species, such as the black rail, is identified, real parties in interest would pursue appropriate permitting with the agency having regulatory authority over the species. Mitigation and monitoring measures stipulated in the permitting instrument would be imposed.

In response to comments made to the RDEIR, real parties in interest commissioned a survey of the project site by a black rail expert. The survey, conducted in June 2006, detected one black rail in a large central wetland in the project site's main drainage. The expert stated real parties in interest would have to consult with the Department of Fish and Game, as the wetland was occupied black rail habitat and the development called for a road to bridge the wetland. The expert recommended the wetland be clearly delineated during construction and no destructive entry be allowed, and that roadways and other drains that might put large quantities of water and noxious runoff into the wetland or cause destructive siltation be routed to prevent those effects from happening.

The expert noted he had "observed Black Rails existing continuously over many years in close proximity to the human disturbances associated with residences, household pets, livestock, intense traffic disturbance, and the like. Wetland islands located where such disturbances are to occur should not be written off as habitat of no future potential; to the contrary, they are worthy of protection and maintenance."

In its Additional Responses, the City reported on the survey results and recommendations, and it determined it had sufficiently mitigated any impacts to the black rail. The City stated the expert's proposed mitigation measures were already included as part of the project design or as mitigation measures contained elsewhere in the RDEIR addressing impacts to wetland habitat: "For example, Mitigation Measures 4.8MM-4(d) and 4.8MM-7 both require fencing and avoidance of wetland areas, and Mitigation Measures 4.8MM-8 and 4.11MM-5(c) address stormwater runoff. Likewise, under the project as designed, all stormwater runoff from the project site (including roads) will be treated prior to discharge and then discharged so as not to allow large quantities of water, noxious runoff, or siltation in any wetland areas, including this central wetland. Thus, Mitigation Measure 4.8MM-13 [(the measure

recommended in the RDEIR specifically to address impacts to freshwater marsh fowl)], together with these other mitigation measures and project design features, will ensure mitigation of impacts to the black rail."

In its findings approving the project, the City adopted all of the mitigation measures referenced in its Additional Responses that address potential impacts on freshwater marsh-occupying birds and their habitats. These measures require the real parties in interest to, among other things, obtain necessary permits from the Army Corps of Engineers and the Department of Fish and Game that regulate developments affecting wetland habitat, replace affected onsite wetlands on a "no-net-loss" basis, use high visibility fencing during construction to mark off and prevent inadvertent encroachment into wetland habitat; develop a siltation and erosion control program for stream crossing areas prior to construction; implement a management plan to minimize production of site runoff and eliminate water quality contaminants originating from the project site; and conduct bird surveys and comply with established protocols if freshwater marsh-occupying birds are located, including relocation of nonlisted species, preventing construction during breeding season, and complying with all mitigation measures imposed by regulatory agencies in the event listed species such as the black rail are discovered.

b. *Trial court's ruling*

At trial, the Foundation claimed the EIR failed to analyze the project's impacts on the black rail and its habitat, failed to discuss mitigation measures to reduce such project impacts, and improperly deferred mitigation until future surveys identify the black rail on the site. The trial court rejected the Foundation's claims. The court ruled that the Foundation's arguments disregarded the EIR's detailed analysis of project impacts on riparian and wetland habitat and its specification of mitigation measures to protect those habitats. Those measures apply to wetlands on the project even when no black rails are found on the site.

The trial court also ruled that the Foundation's arguments failed to recognize that the EIR's mitigation measures set forth mandatory procedures to be followed if a protected species like the black rail was identified on site, including procedures pursuant to the California Endangered Species Act. The court found these measures did not improperly defer the formulation of mitigation measures.

Before us, the Foundation claims the City failed to adopt legally enforceable mitigation measures to protect the black rail. It claims the mitigation measure for protecting listed species, mitigation measure 4.8MM-13, defers the formulation of mitigation to a vague, future regulatory process. It asserts

the trial court's interpretation of this process to include a permitting process from the Department of Fish and Game is not supported by the EIR's express language, which does not mention specifically a Department of Fish and Game permit.

The Foundation also argues the trial court's assumption that the Department of Fish and Game would be the appropriate permitting authority is incorrect. Because the black rail is a "fully protected" bird, the Department of Fish and Game has no authority to permit any activity that could result in the incidental taking of that species. Thus, the Foundation argues, any future mitigation strategy based on a Department of Fish and Game permit would not be enforceable.

### 2. Analysis

■ CEQA requires an EIR to describe feasible mitigation measures which could minimize significant adverse impacts. (Guidelines, § 15126.4, subd. (a)(1).) Measures must be provided for each significant environmental impact identified in the EIR. (Guidelines, § 15126.4, subd. (a)(1)(A).)

"Formulation of mitigation measures should not be deferred until some future time. However, measures may specify performance standards which would mitigate the significant effect of the project and which may be accomplished in more than one specified way." (Guidelines, § 15126.4, subd. (a)(1)(B).)

■ "Impermissible deferral of mitigation measures occurs when an EIR puts off analysis or orders a report without either setting standards or demonstrating how the impact can be mitigated in the manner described in the EIR." (*City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 915–916 [98 Cal.Rptr.3d 137].)

Here, there was no impermissible deferral. The RDEIR fully evaluated any impacts the project would have on freshwater marsh-occupying birds, which included the black rail. It determined there would be no permanent impacts on these birds due to the project's design of protecting wetlands, and it proposed mitigation measures to minimize the project's possible temporary impacts. Thus, mitigation of impacts on black rails and all other freshwater marsh-occupying birds was not improperly deferred.

■ The Foundation's attack on the mitigation measure's requiring compliance with regulatory permitting requirements if an endangered species such as the black rail is discovered is a red herring. "A condition requiring compliance with environmental regulations is a common and reasonable mitigating measure. [Citation.]" (*Sundstrom v. County of Mendocino* (1988)

202 Cal.App.3d 296, 308 [248 Cal.Rptr. 352].) The condition is particularly reasonable here because the City required real parties in interest to obtain all necessary federal and state permits from the Army Corps of Engineers and the state Department of Fish and Game regulating the project's impacts on wetlands, which happen also to be the very procedures in which the project's potential impacts on endangered species would be addressed, arising as they would in this project by means of impacts on wetlands. (See 16 U.S.C. § 1536; Fish & G. Code, § 1600 et seq.)

That a permit cannot be issued to authorize taking a black rail is irrelevant. At issue is whether requiring real parties in interest to obtain the permits that must be obtained and to comply with the mitigation measures imposed on those permits, as well as those imposed by the City, as a way to prevent the project from taking black rails is an enforceable mitigation measure. We conclude it is.

 Courts have approved deferring the formulation of the details of a mitigation measure where another regulatory agency will issue a permit for the project and is expected to impose mitigation requirements independent of the CEQA process so long as the EIR included performance criteria and the lead agency committed itself to mitigation. (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 793–794 [32 Cal.Rptr.3d 177].)

Here, the EIR stated the performance standard regarding black rails clearly: they are "fully protected birds," and thus the project cannot take them incidentally or otherwise. Moreover, the City committed to mitigate any impact on black rails by requiring real parties in interest to obtain all necessary permits regarding the project's impacts on the site's wetlands. In this circumstance, this was a sufficient mitigation measure that did not violate the requirements of CEQA.

E. *Project's consistency with City's general plan*

The Foundation claims the project as approved is inconsistent with the City's general plan. It asserts the project violates the general plan by permitting construction of a roadway on land designated as open space. We, like the trial court, conclude the City did not abuse its discretion in determining the proposed road did not violate its general plan.

1. *Additional background information*

The City's general plan requires the City to apply open space designations to all land located within 50 feet from the banks of streams. The Foundation

claims the City violated this policy when it approved a road, Nature Trail Way, to make two limited encroachments into the 50-foot buffer established for Clover Valley Creek.

In the FEIR, the City determined these two encroachments into the buffer, as well as a pedestrian and bicycle path in the buffer zone, were consistent with the general plan. The FEIR states: "The City of Rocklin has historically allowed for the construction of necessary roadways and public bike trails within the 50-foot open space buffer surrounding creeks. [¶] Additionally, the City determined that if Nature Trail Way was moved outward beyond the 50-foot buffer, the road would require additional grading and the clearing of a number of oak trees which exist on the western side of the proposed location for Nature Trail Way. The City considers the placement of Nature Trail Way within the 50-foot open space buffer area to be the environmentally superior design choice due to the fact that placement outside of the buffer at these locations would result in additional hillside grading and additional loss of oak trees."

The Foundation claims the City's approval of these encroachments into the 50-foot buffer violates the general plan.

### 2. *Analysis*

"A project is consistent with the general plan ' "if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment." ' [Citation.] A given project need not be in perfect conformity with each and every general plan policy. (*Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 719 [29 Cal.Rptr.2d 182] (*Sequoyah*).) To be consistent, a subdivision development must be 'compatible with' the objectives, policies, general land uses and programs specified in the general plan. (*Id.* at pp. 717–718.)" (*Families Unafraid to Uphold Rural etc. County v. Board of Supervisors* (1998) 62 Cal.App.4th 1332, 1336 [74 Cal.Rptr.2d 1] (*FUTURE*).)

A city's determination that a project is consistent with the city's general plan "carries a strong presumption of regularity. (*Sequoyah, supra,* 23 Cal.App.4th at p. 717.) This determination can be overturned only if the [city] abused its discretion—that is, did not proceed legally, or if the determination is not supported by findings, or if the findings are not supported by substantial evidence. (*Ibid.*) As for this substantial evidence prong, it has been said that a determination of general plan consistency will be reversed only if, based on the evidence before the local governing body, '. . . a reasonable person could not have reached the same conclusion.' (*No Oil, Inc. v. City of Los Angeles* (1987) 196 Cal.App.3d 223, 243 [242 Cal.Rptr. 37].)" (*FUTURE, supra,* 62 Cal.App.4th at p. 1338.)

When we apply this standard, "the nature of the policy and the nature of the inconsistency are critical factors to consider." (*FUTURE, supra,* 62 Cal.App.4th at p. 1341.) In addition, general consistencies with plan policies cannot overcome "specific, mandatory and fundamental inconsistencies" with plan policies. (*Id.* at p. 1342.)

Reviewing the evidence that was before the City, no reasonable person would have determined the project was inconsistent with the general plan. Allowance of the encroachment into the 50-foot buffer in this case actually furthers the general plan's policies. The open space land use designation required by the general plan is designed to protect fish and wildlife, natural vegetation and habitat, and scenic areas. The buffer is used to protect those areas from development. In this case, strictly enforcing the buffer defeats its purposes and likely conflicts with other general plan policies, as the City would be required to perform additional grading into a hillside and remove additional oak trees.

Thus, any inconsistency that exists here is not fundamental. Nor was it not discussed. A reasonable person, seeking to implement the general plan's policies of preserving habitat, open space, and scenic vistas, clearly would have concluded the deviation from the buffer zone requirement in this instance better fulfills the general plan's objectives and requirements. The City did not abuse its discretion in finding the project is consistent with the general plan.

III

*Loomis's Appeal*

A. *Impacts on views*

Loomis claims the EIR failed to analyze sufficiently the project's impacts on views or to discuss possible mitigation measures to reduce those impacts. It claims no evidence supports the EIR's conclusion that impacts on views from western Loomis will not be significant, and that the City violated CEQA by not proposing measures to mitigate the impacts on views from Sierra College Boulevard. We disagree, and find the EIR adequately analyzes and mitigates the project's impacts on views. Some residents of Loomis may not want their views towards Clover Valley to change, but CEQA is satisfied if the impacts are disclosed, analyzed, and feasibly mitigated.

### 1. *Additional background information*

#### a. *EIR's analysis of impacts on views*

The RDEIR explains that Loomis lies to the east and southeast of the project site. Only a limited portion of the site is visible to the public from those areas. A portion on the site's eastern part is visible from areas within Loomis and by travelers along a short portion of Sierra College Boulevard. The site's southern part is visible to immediately adjoining residents of the existing Loomis subdivision to the east.

The RDEIR, in impact 4.3I-1, states implementation of the project, with its construction of roadways, infrastructure, and single-family homes, "would constitute a substantial permanent alteration of the existing visual character of the project site." The grading required for the project will eliminate existing vegetation on the project site, substantially altering the site's aesthetic value. This impact is considered significant and unavoidable, even when mitigated by requiring real parties in interest to submit and comply with a revegetation plan for all areas affected by grading.

The RDEIR also lists as two specific impacts the impacts the project will have on views from the Loomis area. The first, impact 4.3I-2, lists as significant and unavoidable the impacts the project will have on views from Sierra College Boulevard and the northwest Loomis area. Sierra College Boulevard runs contiguous to the project site's northeast border along the site's eastern ridgeline. At that point, referred to by the RDEIR as a "summit," the existing land uses distinctly change from rural urbanization to undeveloped land. The project would result in residential and commercial development being built along that portion of Sierra College Boulevard, eliminating the current demarcation between developed and undeveloped land. The RDEIR determined this unbuffered change would be a significant and unavoidable impact to persons traveling along Sierra College Boulevard and who live in Loomis north of the "summit." The RDEIR claims there are no feasible mitigation measures for this impact.

The second relevant impact, impact 4.3I-3, lists as less than significant any aesthetic impact the project will have on views from western Loomis. Residents of that area will have unrestricted views of the development proposed for the site's southeastern ridgeline, south of the "summit" and west of Del Mar Avenue. The project calls for building single-family residences along the top of that ridge, some 100 to 150 feet above Loomis's valley floor. The slope between the Loomis residences and the project's hilltop residences will not be developed and will act as a buffer.

The RDEIR claims impact 4.3I-3 is less than significant and requires no mitigation. The RDEIR states that "[d]espite the project's high visibility, the

project uses would be consistent with the surrounding off-site homes. [¶] Viewers from this area are expected to tolerate a low-to-moderate level of visual change because of the quality of existing views, and because views from residences are particularly sensitive to the residents. Although the project would result in a high level of change as viewed from this area, the proposed project incorporates buffers in the southeast area of the project site. . . . [T]he proposed project includes a buffer zone of 250–280 feet at the crest of the hill on the southeastern boundary of the proposed project site. Therefore, the impact of the anticipated development and the proposed project is considered *less-than-significant*." (Original boldface & italics.)

In its Master Comments of the FEIR, the City responded to public comments critical of the RDEIR's conclusion that certain view-related impacts were less than significant. The City claimed the comments misunderstood the RDEIR's discussion: "[T]he overall aesthetic impact of developing the project site is significant and unavoidable due to the loss of existing visual resources within the project site. The discussions under Impacts 4.3I-3 through 4.3I-6 address the additional question of the aesthetic consistency of the proposed development with surrounding development. Because the project proposes development that is consistent with surrounding development, this additional impact is deemed less than significant, even though the overall aesthetic impact is significant and unavoidable. [¶] As explained in the RDEIR, aesthetic impacts to viewers from western Loomis are not considered to be significant, due to the visual consistency of project development with surrounding off-site homes and the incorporation of a visual buffer of 250–280 feet at the crest of the hill. Contrary to the statement made in the comment, the EIR does not state that homes in the development site will be 'invisible' to Loomis residents. To the contrary, the RDEIR acknowledges that development would be visible." (Italics omitted.)

The City in the FEIR also responded to criticism that the RDEIR did not contain any feasible mitigation measures to minimize the significant impact on views along Sierra College Boulevard. The City disagreed with the claim, stating that "[m]easures to mitigate the impact (though not to a less-than-significant level) would be implemented as part of the project description, including landscaping and other design features to help decrease impacts related to aesthetics and visual resources. The City did not determine that any additional mitigation beyond those included with the project design would be feasible. Additionally, the Alternatives chapter [of the RDEIR] includes several alternatives for the proposed project, such as the Maximum of 180 Units Alternative, which would decrease the total buildout of the proposed project and potentially decrease these impacts."

b. *Trial court's ruling*

Loomis challenged the EIR's analysis of the project's impacts on views. It claimed the analysis was contradictory by stating alteration of views from western Loomis would be less than significant while at the same time stating viewers from this area would experience a high level of change.

Loomis also claimed the analysis was conclusory. The EIR claimed impacts to views from Sierra College Boulevard were significant and unavoidable, and that no feasible mitigation measures existed to mitigate this impact. Loomis argued there was no substantial evidence to claim no feasible mitigation measures existed.

The trial court disagreed with both of Loomis's arguments. It found the City clarified in the Master Responses that it was addressing two separate impacts on views and there was no contradiction. The project's overall aesthetic impact was significant due to the loss of resources within the project site. However, when the project is considered in relation to surrounding development, the impact is less than significant because both the project and the surrounding uses consist primarily of residential development.

The trial court also determined the EIR did not err in concluding the impact to views along Sierra College Boulevard was significant and unavoidable because no feasible mitigation measure is available. It determined substantial evidence in the record established that the project's overall aesthetic impact was significant and unavoidable despite efforts to minimize the impact. The court did not directly discuss the EIR's conclusion that no feasible mitigation measures were available to mitigate this impact.

Loomis claims the trial court's ruling is incorrect. It claims (1) substantial evidence does not support the EIR's conclusion that view impacts from western Loomis toward the project's southeast border will be less than significant; (2) impact 4.3I-3 is internally inconsistent by concluding the project will result in a high level of change to residents of western Loomis but the impact is less than significant; and (3) the EIR fails to discuss possible mitigation measures to the substantial and unavoidable impacts to views from Sierra College Boulevard or to substantiate that any possible mitigation measures were infeasible.

2. *Analysis*

 "Aesthetic issues are properly studied in an EIR to assess the impacts of a project. (Pub. Resources Code, § 21100, subd. (d); *Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 936–940 [21

Cal.Rptr.3d 791].) However, a lead agency has the discretion to determine whether to classify an impact described in an EIR as 'significant,' depending on the nature of the area affected. (Guidelines, § 15064, subd. (b); *Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 492–493 [14 Cal.Rptr.3d 308] (*Mira Mar*); *National Parks & Conservation Assn. v. County of Riverside* (1999) 71 Cal.App.4th 1341, 1357 [84 Cal.Rptr.2d 563].) . . .

" 'In exercising its discretion, a lead agency must necessarily make a policy decision in distinguishing between substantial and insubstantial adverse environmental impacts based, in part, on the setting. (CEQA Guidelines, § 15064, subd. (b).) Where the agency determines that a project impact is insignificant, an EIR need only contain a brief statement addressing the reasons for that conclusion. (CEQA Guidelines, § 15128.)' (*Mira Mar, supra,* 119 Cal.App.4th at pp. 492–493.) [¶] . . . [¶]

"The possibility of significant adverse environmental impact is not raised simply because of individualized complaints regarding the aesthetic merit of a project. (See *Bowman v. City of Berkeley* (2004) 122 Cal.App.4th 572, 584–593 [18 Cal.Rptr.3d 814].) 'Under CEQA, the question is whether a project will affect the environment of persons in general, not whether a project will affect particular persons.' (*Mira Mar, supra,* 119 Cal.App.4th at p. 492.)" (*Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 375–376 [54 Cal.Rptr.3d 485], fn. omitted (*Eureka Citizens*).)

Disagreements regarding the adequacy of an EIR's impact analysis will be resolved in favor of the lead agency if any substantial evidence supports the lead agency's determination. (See *Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d at p. 409; see also 1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2011) § 13.26, pp. 637–638 (rev. 1/10).)

Loomis claims the EIR's conclusion that impacts on views from western Loomis toward the project's southeastern border would be a "high level" of change but would not be significant is not supported by substantial evidence and is contradictory. We disagree. The EIR stated an impact to aesthetic resources would be considered significant if the proposed project would "[s]ubstantially alter or degrade the visual character or quality of the project site; or [¶] [h]ave a substantial adverse effect on a scenic vista . . . ." Using this standard of significance, the EIR concluded the impacts on views from western Loomis toward the project's southeastern border would be less than significant.

Substantial evidence supports this conclusion, and the finding is not contradictory. The EIR claimed the impact would not be significant due to the buffer between the valley floor and the new homes to be built on the top of the ridge. Although it is a "high level" of change, it is not a significant impact because the area is already a residential area. By containing factual statements addressing why this impact is not significant, the EIR provided substantial evidence supporting its conclusion, and the conclusion is not contradictory. (*Eureka Citizens, supra*, 147 Cal.App.4th at p. 376.)

Loomis also faults the EIR for not setting forth feasible mitigation measures to minimize the significant impacts to views along Sierra College Boulevard at the project's northeast border. It suggests the EIR could have recommended measures such as reduced building sizes, screening using vegetation, avoiding building in key locations on the ridge, limiting the height of homes on the ridge, imposing design requirements such as colors to blend with the hillsides, or modifying building features to reduce light and glare. Instead, Loomis claims, the EIR simply concluded the significant impacts could not be mitigated.

 EIR's are to identify feasible mitigation measures for each significant impact. (Guidelines, §§ 15121, subd. (a), 15126.4, subd. (a).) "Although an EIR must identify proposed mitigation measures for adverse effects of the project, ' "CEQA does not require analysis of every *imaginable* alternative or mitigation measure; its concern is with *feasible* means of reducing environmental effects." ' [Citation.]" (*Concerned Citizens of South Central L.A. v. Los Angeles Unified School Dist.* (1994) 24 Cal.App.4th 826, 841 [29 Cal.Rptr.2d 492], original italics.) An EIR need not identify and discuss mitigation measures that are infeasible.

Here, the FEIR noted that feasible mitigation measures, including some similar to those suggested by Loomis would be imposed at the design stage. These included landscaping and specific design features to help decrease aesthetic impacts.

In another section, the FEIR also explained why one of Loomis's proposed mitigation measures, relocating lots from off of the ridge, was not feasible. Such an action may not be legally feasible in light of the commitments the City made to real parties in interest in the development agreement. Moreover, relocating development off the ridge to some other location on the project site would affect open space areas that have been planned to protect the site's most environmentally sensitive resources. This proposed mitigation measure thus could actually impact the environment more than the project would as currently planned.

 Nothing in CEQA requires an EIR to explain why certain mitigation measures are infeasible. Rather, the statute directs agencies to propose feasible mitigation measures in an EIR. Substantial evidence indicates the City has analyzed the project's impacts on views, and has proposed feasible mitigation measures to minimize those impacts. That is sufficient for CEQA.

## B. *Impacts on traffic*

Loomis claims the EIR is inadequate because it did not analyze traffic impacts at two particular intersections in Loomis, and because it did not analyze traffic impacts during school travel times.

The City claims the EIR's analysis of impacts at 17 different intersections, including three in Loomis, and its use of "PM peak hour" traffic analyses, when traffic is heavier than in "AM" (morning) conditions, satisfy the demands of CEQA. We, as did the trial court, agree with the City.

 "CEQA does not require a lead agency to conduct every recommended test and perform all recommended research to evaluate the impacts of a proposed project. The fact that additional studies might be helpful does not mean that they are required." (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1396 [133 Cal.Rptr.2d 718].) "CEQA does not require a lead agency to conduct every test or perform all research, study, and experimentation recommended or demanded by commentors." (Guidelines, § 15204, subd. (a).)

Rather, CEQA requires an EIR to "be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible." (Guidelines, § 15151.)

The EIR's analysis of traffic satisfied this standard. The RDEIR analyzed levels of service at 17 nearby intersections during the "PM" (evening) peak hour under five different scenarios: the existing conditions, the existing conditions plus the project conditions, the year 2025 projected conditions under the current general plan if the project is not built, the year 2025 projected conditions if the project is built, and the year 2025 projected conditions under a new, proposed general plan if the project is built. The analysis relied upon PM peak hour counts for two reasons: the City has historically relied upon PM peak hour counts, and PM conditions tend to have higher traffic volumes than AM (morning) conditions. The analysis determined the project's impact on traffic under each of these scenarios would be less than significant.

Loomis does not fault this analysis. Rather, it claims the City did not do enough analysis because it omitted two additional Loomis intersections, King Road at Taylor Road, and Horseshoe Bar Road at Interstate 80. It also claims the City erred by not analyzing the AM school time period.

In the FEIR, the City responded to Loomis's criticisms. It analyzed the percent changes in daily traffic volumes to the two locations suggested by Loomis under three scenarios, and determined the increase in volume to be as follows:

| Scenario | King Road/Taylor Road | Horseshoe Bar Rd/I-80 |
|---|---|---|
| Existing plus project | Less than 2% | Less than 2% |
| 2025 current general plan plus project | 14% | Less than 2% |
| 2025 proposed general plan plus project | 4% | Less than 2% |

Based on this analysis, the City determined that changes in traffic volumes at these two intersections would be small, and thus the City did not perform a formal level of service intersection analysis for them.

The City also explained its use of the PM peak period for its analysis instead of Loomis's proposed "school time" period. The PM peak hour is when the highest traffic volumes are on the roadway system. Also, there is no evidence that time periods before or after school would be more critical than the PM peak hour.

The EIR's analysis of traffic impacts thus satisfied CEQA. By addressing Loomis's concerns in the FEIR, the EIR gave decision makers sufficient information of the project's impacts on traffic, in light of what was reasonably feasible to analyze. CEQA required nothing more.

C. *Impacts·on water supply*

Loomis claims substantial evidence does not support the EIR's conclusion that an adequate water supply will be available for the project. It faults the EIR for allegedly not demonstrating the water supply is sufficiently guaranteed for this project in the event the project is delayed and other development projects use the available water first. We conclude the EIR's analysis is sufficient.

1. *Additional background information*

The RDEIR explained that the City's water is provided by the Placer County Water Agency (PCWA). PCWA approved the City's request to supply

water to the project. It determined it had an adequate supply and sufficient infrastructure to meet the project's demands as well as the anticipated demands for new development in western Placer County for the next 20 years.

As of 2007, PCWA had 17,358 acre-feet per year (afy) of uncommitted water to be used by new development in western Placer County. PCWA calculated this project at buildout would require approximately 631 afy. The RDEIR thus concluded the project currently had a sufficient water supply.

However, the RDEIR noted that because PCWA has a "first-come, first-serve[d]" policy for serving new customers, a delay in constructing the project could jeopardize the project's access to the surplus water. If that were to happen, certain infrastructure projects already planned by PCWA would have to be implemented to provide adequate water to the project. PCWA would determine the need for these improvements when real parties in interest paid to be connected to the system. If PCWA determined it did not have adequate supply to service the project at that time, the project would not proceed until such time when the infrastructure improvements were made. If PCWA determined it had adequate supply for the project, it would guarantee water to serve the site.

In response to comments about the RDEIR's water supply analysis, the City in its Master Comments to the FEIR expanded its discussion of water supply impacts. Regarding the possibility of PCWA not having sufficient supplies if the project is delayed unexpectedly, the City explained that PCWA has additional water rights to the American River, which it is currently negotiating to transfer to the Sacramento River. If the transfer occurs this additional water would be available to service the project.

Specifically, PCWA has rights to an additional 35,000 afy of water from the American River through the federal Central Valley Project administered by the Bureau of Reclamation. The City anticipates this water being available by 2015 by means of a unique contractual agreement. Pursuant to an agreement signed by numerous water purveyors in Northern California known as the Water Forum Agreement, PCWA has applied to divert 35,000 afy from the Sacramento River in lieu of taking the same amount of water from the American River. This diversion is already undergoing environmental review under CEQA and its federal counterpart.

The City claims a reasonable certainty that this water will be available to it. The diversion is based on actual rights the City has to American River water, not so-called entitlements to paper water; the diversion has the support of all Water Forum Agreement signatories as it will have less environmental

impact than taking water from the American River; and the project has been encouraged by federal legislation.

The City acknowledges the diversion faces regulatory hurdles that could cause delays: completion of environmental review, approval of a contract between PCWA and the Bureau of Reclamation, approval of a wetlands "fill" permit by the Army Corps of Engineers under the federal Clean Water Act of 1977 (Pub.L. No. 95-217 (Dec. 27, 1977) 91 Stat. 1566), and consultations required under the federal Endangered Species Act of 1973 (16 U.S.C. § 1531 et seq.). However, the City and other agencies participating in the diversion project have already taken steps to minimize impacts the project may have on endangered species.

The FEIR reminds the reader that notwithstanding these contingencies, PCWA has certified that it has sufficient water supplies for this project and all other contemplated development within its service area through the next 20 years barring any unforeseen and unexpected delays in project development.

2. *Analysis*

In *Vineyard Area Citizens, supra*, 40 Cal.4th 412, our Supreme Court established four principles that govern an EIR's analysis of water supply impacts. First, "[d]ecision makers must, under the law, be presented with sufficient facts to 'evaluate the pros and cons of supplying the amount of water that the [project] will need.' [Citation.]" (*Id.* at p. 431.)

Second, an EIR "evaluating a planned land use project must assume that all phases of the project will eventually be built and will need water, and must analyze, to the extent reasonably possible, the impacts of providing water to the entire proposed project. [Citation.]" (*Vineyard Area Citizens, supra*, 40 Cal.4th at p. 431.)

"Third, the future water supplies identified and analyzed must bear a likelihood of actually proving available; speculative sources and unrealistic allocations ('paper water') are insufficient bases for decisionmaking under CEQA. [Citation.] An EIR for a land use project must address the impacts of *likely* future water sources, and the EIR's discussion must include a reasoned analysis of the circumstances affecting the likelihood of the water's availability." (*Vineyard Area Citizens, supra*, 40 Cal.4th at p. 432, original italics.)

Fourth, "where, despite a full discussion, it is impossible to confidently determine that anticipated future water sources will be available, CEQA requires some discussion of possible replacement sources or alternatives to

use of the anticipated water, and of the environmental consequences of those contingencies. [Citation.]" (*Vineyard Area Citizens, supra,* 40 Cal.4th at p. 432.)

Loomis targets the EIR's compliance with *Vineyard Area Citizens*'s third and fourth principles: the likelihood that identified future water supplies will be able to provide the needed water, and a discussion of possible replacement sources if it is impossible to confidently determine the anticipated water will be available. Loomis claims the EIR's analysis fails to verify PCWA water will be able to provide the needed water due to PCWA's "first come, first serve[d]" policy, and that the EIR's discussion of a possible replacement source, the Sacramento River diversion water, is too uncertain a possibility to be considered as a viable replacement source.

Our review convinces us the EIR satisfies the standards set forth in *Vineyard Area Citizens.* The EIR identifies future water supplies sufficient to satisfy the project's needs that have a likelihood of actually being available, it analyzes the circumstances affecting the likelihood of the water's availability, and it discusses possible replacement sources in the event the primary source proves to be unavailable.

Pursuant to statutory mandates, PCWA certified to the City in writing that it has sufficient water to meet the development's needs, and, indeed, the needs of all other contemplated development within PCWA's service area for the next 20 years. "Government Code section 66473.7 generally requires a city or county, before approving a subdivision map for a residential development of more than 500 units, to obtain from the applicable public water system a 'written verification' that adequate water supplies will be available for that project as well as other existing and planned future uses for a projected 20-year period. When the verification rests on supplies not yet available to the water provider, it is to be based on firm indications the water will be available in the future, including written contracts for water rights, approved financing programs for delivery facilities, and the regulatory approvals required to construct infrastructure and deliver the water. (*Id.,* subd. (d).) The subdivision map may be approved only if the water system verifies, or the city or county finds on substantial evidence, that water supplies will be adequate. (*Id.,* subd. (b); see Tepper, *New Water Requirements for Large-Scale Developments* [(Jan. 2005)] 27 L.A. Law. [18,] 20.)" (*Vineyard Area Citizens, supra,* 40 Cal.4th at p. 433.)

In addition, "Water Code sections 10910 to 10912, enacted in 1995 but substantially amended in 2001, apply more broadly to any large land use project (not only residential developments) and to approval of any such project subject to CEQA (not only to subdivision map approvals). (Wat. Code,

§§ 10910, subd. (a), 10912, subds. (a), (b).) They require the city or county considering a project to obtain, at the outset of the CEQA process, a water supply 'assessment' from the applicable public water system. (Wat. Code, § 10910, subd. (b).) The 'water supply assessment' is then to be included in any CEQA document the city or county prepares for the project. (Wat. Code, § 10911, subd. (b).) With regard to *existing* supply entitlements and rights, a water supply assessment must include assurances such as written contracts, capital outlay programs and regulatory approvals for facilities construction (paralleling the assurances Gov. Code, § 66473.7, subd. (d) requires for future water), but as to additional *future* supplies needed to serve the project, the assessment need include only the public water system's plans for acquiring the additional supplies, including cost and time estimates and regulatory approvals the system anticipates needing. (Wat. Code, §§ 10910, subd. (d)(2), 10911, subd. (a).)" (*Vineyard Area Citizens, supra*, 40 Cal.4th at p. 433, original italics, fn. omitted.)

 "Taken together, Water Code sections 10910 to 10912 and Government Code section 66473.7 thus demand . . . that 'water supplies must be identified with more specificity at each step as land use planning and water supply planning move forward from general phases to more specific phases.' The plans and estimates that Water Code section 10910 mandates for future water supplies at the time of *any* approval subject to CEQA must, under Government Code section 66473.7, be replaced by firm assurances at the subdivision map approval stage." (*Vineyard Area Citizens, supra*, 40 Cal.4th at pp. 433–434, original italics.)

Loomis claims PCWA's written certification of sufficient water supply for this project does not qualify as a firm assurance because PCWA's "first come, first serve[d]" policy leaves open the possibility of not having sufficient water should this project be unexpectedly delayed. However, the Supreme Court stated that to pass muster under CEQA, the future water supplies identified and analyzed "must bear a likelihood of actually proving available." (*Vineyard Area Citizens, supra*, 40 Cal.4th at p. 432.) Clearly, PCWA's written certification that it currently has sufficient water for this project and all other developments contemplated for the next 20 years satisfies this test. It has over 17,000 afy of unclaimed water, and this project at full buildout will require only 631 afy, or approximately 4 percent, of that water. This verification rests on supplies that are available. There is no mere likelihood here. This evidence establishes a virtual certainty the water will be available, far more than CEQA requires.

Also, because in this instance it was not "impossible to confidently determine that anticipated future water sources will be available," the EIR was not required to satisfy *Vineyard Area Citizens*'s fourth principle, that of

including some discussion of a possible replacement source. Nevertheless, the EIR included that discussion. It explained PCWA would likely obtain another 35,000 afy of water from the Sacramento River, subject to ongoing governmental approvals. That discussion was also adequate, as it related only to a viable future source that was not likely needed to provide water to this project. Thus, like the assessment required under Water Code section 10910, the EIR's analysis needed to include only PCWA's plans for acquiring the additional water and the regulatory approvals it would need to acquire the water. This EIR included that discussion.

We thus conclude the EIR complied with CEQA's requirements for analyzing water supply, and that substantial evidence supports the EIR's and the City's determinations that the project's impacts on water supply would not be significant.

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to the City and real parties in interest. (Cal. Rules of Court, rule 8.278(a).)

Hull, J., and Robie, J., concurred.