Filed 9/11/15  SOS-Danville Group v. Town of Danville CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SOS-DANVILLE GROUP,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>TOWN OF DANVILLE et al.,<br><br>    Defendants and Appellants;<br><br>SUMMERHILL HOMES, LLC, et al.,<br><br>    Real Parties in Interest and<br>    Appellants. | A143010<br><br>(Contra Costa County<br>Super. Ct. No. MSN13-1151) |

This case concerns the Town of Danville's (Town) approval of the Magee Ranch Residential Project (Project), which would develop 69 single-family homes in an agricultural area south of Diablo Road in Danville.  SOS-Danville Group (plaintiff) filed a petition for a peremptory writ of mandate and complaint for declaratory relief challenging the approval, as well as the Town's certification of the final environmental impact report (EIR) for the Project.

The petition was granted in part and denied in part.  The trial court found for plaintiff on two issues.  First, it concluded the EIR failed to properly address the Project's impacts on bicycle safety in violation of the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; CEQA).  Second, it held the proposed development was inconsistent with the Town's general plan in violation of the Planning and Zoning Law (Gov. Code, § 65000 et seq.).  The resulting judgment enjoined the

Town as well as the real parties in interest (Real Parties)[1] from issuing any development permits or undertaking any construction activities in connection with the Project.

The Town and Real Parties (collectively defendants) now appeal, arguing the trial court's findings regarding CEQA and the Planning and Zoning Law were in error. Plaintiff has filed a cross-appeal, arguing the trial court erred in rejecting its claim that, in approving the project, the Town improperly determined the zoning density of the parcels at issue. We affirm the trial court's judgment as to plaintiff's CEQA claim, but reverse as to the Planning and Zoning Law claim. We also find unavailing plaintiff's cross-appeal.

## I. BACKGROUND

### A. *The General Plan*

The Project is governed by Danville's 2010 General Plan (General Plan). The General Plan includes a land use map, which indicates four basic land use types for areas within Danville: residential, commercial, public, and open space. The General Plan further breaks down each of these land use types into more specific designations. For example, open space includes general open space areas, agricultural open space areas, and parks and recreation areas. Descriptions of the specific designations in the General Plan set forth the range of permitted densities, consistent zoning districts, and narratives addressing general characteristics, among other things. According to the General Plan, "Specific zoning districts must correspond with land use map designations and the geographic extent of these designations on the land use map, even if they vary from actual existing conditions."

The General Plan also describes 14 special concern areas, one of which—the Magee Ranch—encompasses the Project site. According to the General Plan: "The Special Concern Areas require consideration of planning issues that are unique to a particular geographic area within the Town. The Special Concern Areas text presented

---

[1] The real parties are SummerHill Homes LLC, the project developer (SummerHill Homes), and Magee Investment Company and Teardrop Partners, L.P., who own the Project site.

[in the General Plan] identifies land use policies not shown on the Land Use Map or reflected in other parts of the General Plan."

In 1999, after the operative General Plan was adopted, a Danville citizen's group circulated an initiative petition for its amendment, which became known as Measure R. Measure R would have required voter approval for a wide range of rezonings and land use approvals affecting open space and agricultural land, including conversion of two or more acres of contiguous open space to any nonopen space use. The Town's council introduced a competing petition, Measure S, which provides open space land use designations may only be amended by (1) a vote of the people, or (2) a 4/5 vote of the Town's council if the council finds the amendment is required by state or federal law or is necessary to avoid an unconstitutional taking. Unlike Measure R, Measure S does not require voter approval to authorize zoning changes consistent with the General Plan. Both measures were approved by the voters, but because Measure S received more votes, it was enacted while Measure R was not.

## B. *The Project Site*

The Project site is about 410 acres and is located on a portion of the Magee Ranch that has been subdivided several times over the last 60 years. The property is generally characterized by open grass-covered hills with scattered trees. It is currently used for beef cattle operations and horse ranches, and is surrounded by single-family residential neighborhoods. Public and private open space areas are also located in the vicinity.

About 201 acres of the site has been designated rural residential and zoned A-2 (general agriculture). According to the General Plan, the density for rural residential areas is one unit per five acres, and the designation is used for "transitional areas between lower density single family development and significant agricultural or open space resources." While the rural residential designation "permits large lot, 'ranchette' type development," the General Plan states "clustering is encouraged to permit the development of suitable building sites and preservation of open space areas." According to the General Plan, the rural residential designation is consistent with A-2 and P-1 (planned unit development district) zoning. Lots zoned A-2 must be no smaller than five

3

acres. According to the General Plan, P-1 zoning "allows flexible development standards which are created and implemented on a project-by-project and site-by-site basis," and "may allow for the retention of a greater portion of the land as open space and create more flexible project designs that would not otherwise be permitted by conventional zoning."

Another 199 acres of the site has been designated agricultural open space in the General Plan. The agricultural open space designation is applied to land currently under Williamson Act[2] contract or in agricultural use, and thus the General Plan does not set forth a density range for these areas. In the event a Williamson Act contract is not renewed, the General Plan encourages continued agricultural use and states the underlying zoning density—either one unit per 20 acres or one unit per five acres—would apply. While the General Plan lists only A-2 zoning as consistent with the agricultural open space designation, the agricultural open space within the Project site is currently zoned A-4, which allows for densities of one unit per 20 acres.[3]

As noted above, the General Plan designates the Magee Ranch as a special concern area. According to the General Plan, the Magee Ranch special concern area "contains some of the most spectacular and unique scenery in Danville," and the General Plan "strongly supports retention of this character and protection of the views and vistas from the road." The Plan also states: "Despite the A-2 (General Agricultural) zoning on much of the site, subdivision of this Special Concern Area into five-acre 'ranchette' sites . . . is strongly discouraged. Such development . . . could substantially diminish the

---

[2] The Williamson Act establishes a mechanism for saving agricultural land by allowing counties to create agricultural preserves and then to enter into contracts with landowners within those preserves. (Gov. Code, § 51200 et seq.) A Williamson Act contract obligates the landowner to maintain the land as agricultural for 10 or more years, with resulting tax benefits. (Gov. Code, §§ 51240–51244.) Absent contrary action, each year the contract renews for an additional year, so that the use restrictions are always in place for the next nine to 10 years. (*Id.*, § 51244.)

[3] As to the remaining 10 acres of the Project site, five have been designated general open space and zoned P-1, and the other five have been designated "Residential - Single Family - Low Density" and zoned A-2.

4

visual qualities of the area. On the other hand, transferring allowable densities to a limited number of areas within the ranch would enable the bulk of the site to be set aside as permanent open space."

## C. *Project Review and Approval*

SummerHill Homes submitted its application to develop the Project in 2010. The initial application proposed the development of 85 single-family lots, most of which would range from 10,000 to 22,000 square feet. The homes would be clustered on the flatter portions of the site, preserving approximately 291 acres as permanent open space. The application proposed rezoning the Project site from A-4 (agricultural preserve) and A-2 (general agriculture) to P-1 (planned unit development district). During the review period, the Project was reduced from 85 to 69 units and the amount of land preserved as open space was increased to 373 acres (91 percent of the Project site).

SummerHill Homes asserted a General Plan amendment was unnecessary because its proposal was consistent with the General Plan's description of the Magee Ranch special concern area. Likewise, the Town maintained the Project did not trigger the approval requirements of Measure S, asserting Measure S did not apply to rezonings or other land use decisions that are consistent with the General Plan. The Town explained that P-1 zoning "permits density under the base zoning (in this instance one unit per five acres) to be clustered or located to the least sensitive areas of the property," and that the General Plan's discussion of the Magee Ranch special concern areas specifically encouraged such development.

The final EIR for the Project was submitted in April 2013. The EIR dismissed concerns the Project would pose increased traffic hazards to bicyclists along Diablo Road. The report explained that while the Project would add traffic to the road, it would not change existing conditions for cyclists, and physical constraints limited the feasibility of widening for future bicycle facilities. Those constraints included narrow roadways and shoulders, existing drainages, and the close proximity of trees and telephone poles.

In June 2013, the Town's council unanimously certified the final EIR and approved the Project, including the request to rezone the site to P-1.

5

**D.** *Procedural History*

About a month after the project was approved, plaintiff filed a petition for writ of mandate and complaint for declaratory relief alleging three causes of action. First, plaintiff asserted the Town violated CEQA, arguing the EIR was inadequate because, among other things, it failed to disclose or adequately mitigate the Project's significant bicycle safety impacts. Second, plaintiff asserted the Town violated the Planning and Zoning Law because the Project was inconsistent with the General Plan. According to plaintiff, the Project called for the rezoning of the entire Project site to P-1, but P-1 is not an allowable zoning for land designated as agricultural open space under the General Plan. Third, plaintiff sought a judicial declaration of the allowable zoning classification on land designated as agricultural open space in the General Plan. According to the complaint, there was a disagreement among the parties about how such property should be zoned upon the expiration of a Williamson Act contract. Plaintiff asserted the land should revert to A-4 zoning if that zoning had been applied, but was ineffective while the contract was in operation. The Town claimed the zoning should revert to whatever had been in effect prior to the establishment of the contract, even if the property had since been rezoned.

Defendants demurred to the third cause of action for declaratory relief, and the trial court sustained the demurrer with leave to amend. Plaintiff filed an amended petition, and defendants again demurred. The trial court then severed the CEQA and Planning and Zoning Law causes of action for a separate trial. On June 25, 2014, the trial court tried the CEQA and Planning and Zoning Law causes of action and heard oral argument on the demurrer on the claim for declaratory relief.

The trial court later issued an order regarding the first two claims for relief. The trial court rejected all of plaintiff's CEQA claims, except the one dealing with bicycle safety. The court also found for plaintiff on its Planning and Zoning Law claim, concluding the Project was inconsistent with the General Plan. The trial court reasoned that, in approving the Project, the Town changed the General Plan's description of agricultural open space to include P-1 zoning as a consistent zoning category, and it did

6

so without putting the issue to a popular vote as required by Measure S. The trial court also issued a separate order sustaining the Town's demurrer to plaintiff's remaining claim for declaratory relief without leave to amend.

The trial court entered judgment, issuing a peremptory writ of mandate ordering the Town to rescind its actions in approving the Project and certifying the EIR. The court also permanently enjoined defendants from undertaking any construction activities or issuing any construction or development permits in connection with the Project.

## II. DISCUSSION

### A. *CEQA*

"CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390.) The EIR is "the heart of CEQA" (Cal. Code Regs., tit. 14, § 15003, subd. (a)), and its purpose is "to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project" (Pub. Resources Code, § 21061).

In this case, plaintiff asserted the Town violated CEQA because its analysis of the Project's traffic impacts was inadequate in several respects. The trial court rejected all of plaintiff's CEQA claims except those pertaining to bicycle safety. The court stated: "The [EIR] appears to be based on the assumption that because the existing conditions are dangerous for bicycles, any added danger would not be a significant impact; but it does not provide any statistics about actual or projected numbers, or severity, of accidents. Nor does the response mention the possibility of any mitigation measure, other than a vague reference to the 'limit[ed] feasibility' of widening the road to create a bicycle lane. It should have explained the extent to which that feasibility is limited, not just *why* it is limited. The response also should have addressed at least some of the mitigation possibilities raised in the comments."

7

Defendants argue the trial court erred in finding the Project would have a significant impact on bicycle safety because there was substantial evidence to the contrary.[4] They also challenge the trial court's finding that the Town failed to adequately respond to public comments regarding bicycle safety. In a CEQA action, our inquiry "shall extend only to whether there was a prejudicial abuse of discretion," which is established "if the [Town] has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (Pub. Resources Code, § 21168.5.) We review the Town's action, not the trial court's decision, and in that sense we conduct an independent review. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427.) We conclude substantial evidence does not support the Town's finding that the Project would have no significant impact on bicycle safety, and we therefore need not and do not address whether the Town adequately responded to public comments on the issue.[5]

An agency must find a project may have a significant effect on the environment where, among other things, "[t]he environmental effects of a project will cause substantial adverse effects on human beings, either directly or indirectly." (Cal. Code Regs., tit. 14, § 15065, subd. (a)(4).) A project's environmental effects are determined by comparison to existing baseline conditions. (Cal. Code Regs., tit. 14, § 15125, subd. (a).)

---

[4] Defendants also argue CEQA imposes no categorical requirement that an EIR analyze and discuss potential project impacts on bicycle safety. However, their own draft EIR states a project impact would be considered significant if the Project caused unsafe conditions for pedestrians and cyclists. Thus, the EIR itself accepts the premise that bicycle safety is a "reasonably foreseeable indirect physical changes in the environment which may be caused by the project." (Cal. Code Regs., tit. 14, § 15064, subd. (d).) Moreover CEQA requires an agency to find a project may have a significant impact where there is substantial evidence the project will cause substantial adverse effects on human beings. (Cal. Code Regs., tit. 14, § 15065, subd. (a)(4).)

[5] Defendants argue plaintiff waived its substantial evidence challenge by failing to lay out all of the evidence favorable to the Town in its response brief. But defendants' authority merely requires an "appellant" challenging an EIR to disclose evidence favorable to the other side. (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1266.) In this case, plaintiff is the respondent. In any event, we find plaintiff's discussion of the evidence sufficient.

When an agency concludes a particular environmental effect of a project is not significant, the EIR must contain a brief statement indicating the reasons for that conclusion. (*Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1112–1113 (*Amador*).) However, a detailed analysis is not necessary. (*Ibid.*)

Notwithstanding the above requirements, "the agency's conclusion that a particular effect of a project will not be significant can be challenged as an abuse of discretion on the ground the conclusion was not supported by substantial evidence in the administrative record." (*Amador*, *supra*, 116 Cal.App.4th at p. 1113.) In the CEQA context, substantial evidence means "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. Whether a fair argument can be made that the project may have a significant effect on the environment is to be determined by examining the whole record before the lead agency. Argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment does not constitute substantial evidence." (Cal. Code Regs., tit. 14, § 15384, subd. (a).)

In this case, the final EIR addressed the significance of the Project's impacts on bicycle safety in response to various comments submitted by the public. Specifically, the EIR stated: "Diablo/Blackhawk Road is a popular route used by bicyclists. However, portions of the roadway are narrow and do not have bike lanes. This route is not a designated Bike Route in the Town's General Plan. Given the narrow right-of-way along Diablo/Blackhawk, both vehicles and bicyclists should use caution. While the project would add traffic to Diablo/Blackhawk Road, it would not significantly change existing conditions for cyclists. In addition, the physical constraints along Diablo/Blackhawk Road (i.e., narrow roadways and shoulders, existing drainages, the close proximity of trees and telephone poles) limit the feasibility of widening for future bicycle facilities."

9

Relying on *Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, defendants contend the final EIR's short discussion of bicycle safety alone constitutes substantial evidence the Project would not have a significant impact. But the EIR in *Clover Valley Foundation v. City of Rocklin* contained factual statements addressing why the impacts at issue were not significant. (*Id.* at p. 244.) Here, the only pertinent facts set forth in the final EIR are that the roadways at issue are already dangerous for cyclists, the Project would increase traffic on those roadways, and widening the roadways would be difficult. While the final EIR concludes the Project would not change existing conditions, it does not explain why or point to any facts or evidence that would support the conclusion.

Defendants further argue the draft EIR's discussion of traffic impacts and the traffic study on which that discussion is based provide additional support for the finding of no significance. Again we disagree. The underlying traffic study does not offer any conclusions regarding the impact of the Project on bicycle safety. It merely notes Diablo and Blackhawk Roads have narrow shoulders and higher vehicle speeds and thus should be used only by advanced cyclists. The study does state the Project would result in approximately one additional bike trip during the "AM, school PM, and PM peak hours," but it does not discuss the impact of increased traffic on cyclists who already use the roads, including the thousands of recreational cyclists who use Diablo Road to access Mount Diablo. The study also states the General Plan calls for public access easements to be provided where appropriate and the Project's plan includes a paved trail that connects portions of the site. However, as defendants concede, even with these trails, cyclists would still need to use portions of Diablo and Blackhawk Roads.

Nor does the draft EIR offer substantial evidence concerning the Project's impacts on bicycle safety. Defendants argue we should infer the draft EIR concludes the Project would not have a significant impact on bicycle safety. They point out the draft EIR states the Project's main entrance had the potential to provide an unsafe condition for pedestrians, but it does not contain a similar finding with respect to cyclists. Defendants are essentially arguing the EIR's failure to discuss an impact constitutes substantial

10

evidence that impact is not significant. The position is untenable, especially since the EIR is intended "to demonstrate to an apprehensive citizenry that the agency has in fact analyzed and considered the ecological implications of its action." (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 86.) For similar reasons, we find unpersuasive defendants' contention that their consultants would have called out bicycle safety issues in their traffic study if they had observed them during their onsite observations.[6]

A finding of no significant impact is further undermined by public comments concerning bicycle safety on Diablo Road. For example, an executive board member of the Valley Spokesmen Bicycle Club stated the road is a major attraction for cyclists because it is a route to Mount Diablo State Park. He also observed the road is narrow with many curves and is therefore a safety concern for bicycle travel, and concluded "adding additional traffic to this inadequate road will have significant impact on the safety of bicycle travel." A local planning commissioner expressed similar concerns. Defendants dismiss these comments, arguing increased accident rates and the effect of automobile traffic on bicycle safety are not matters susceptible to proof by lay observation. But the comments were relevant to establish baseline conditions on Diablo Road, and it is logical to assume additional traffic caused by the Project has the potential to make these conditions worse.

Defendants argue plaintiff has not offered studies or expert testimony concerning the effect of the Project on bicycle safety. But defendants have pointed to no authority requiring a CEQA petitioner to introduce such evidence in this context. The pertinent question is whether substantial evidence supports a finding of no significant impact.

---

[6] In their reply brief, defendants also rely on the testimony of Tai Williams, the Town's community development director, at a city council hearing. Williams stated the traffic consultants conducted field observations, during which they investigated bicycle safety issues, and "the conclusion was that no additional studies were warranted." In other words, Williams asserted if there had been something worth studying, the consultants would have studied it. However, as discussed above, CEQA requires something more than an absence of discussion to support a finding of no significant impact.

While an EIR need not analyze speculative impacts (*Friends of the Eel River v. Sonoma County Water Agency* (2003) 108 Cal.App.4th 859, 876–877), the record indicates the Project's potential impacts on bicycle safety rise above conjecture. Cycling conditions on Diablo Road are already problematic, and it is undisputed the Project would add more traffic. Moreover, there is no indication the Town has conducted a "thorough investigation" or determined that impacts on cyclists are "too speculative for evaluation." (Cal. Code Regs., tit. 14, § 15145.)

Defendants further argue no prejudice resulted from the EIR's discussion, or lack thereof, of the Project's impacts on bicycle safety. "An omission in an EIR's significant impacts analysis is deemed prejudicial if it deprived the public and decision makers of substantial relevant information about the project's likely adverse impacts. . . . Insubstantial or merely technical omissions are not grounds for relief." (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 463.) Notwithstanding the contents of the EIR, defendants argue the Town and the public had ample opportunity to consider the Project's impacts on bicycle safety. Defendants assert various individuals aired their concerns regarding bicycle safety and potential mitigation measures at public hearings on the Project and, as a result, any additional discussion of bicycle safety would not have added significantly to the public's understanding. We disagree. That members of the public raised the issue of bicycle safety at public hearings does not excuse the Town's failure to determine whether the Project might have a significant impact on cyclists. Moreover, it is unclear how the Town could have made a considered judgment regarding the feasibility of various mitigation options when it declined to examine the scope or severity of the underlying bicycle safety problem.

Accordingly, we affirm the trial court's determination that the Town violated CEQA by failing to adequately investigate bicycle safety and discuss it in the EIR.

**B. *Planning and Zoning Law***

Defendants claim the trial court erred in finding the Project is inconsistent with the General Plan in violation of the Planning and Zoning Law. We agree.

The Planning and Zoning Law provides every city and county must adopt a "comprehensive, long-term general plan for the physical development of the county or city, and of any land outside its boundaries which in the planning agency's judgment bears relation to its planning." (Gov. Code, § 65300.) A general plan is essentially the " 'constitution for all future developments' " within a city or county. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 570.) Its elements must comprise "an integrated, internally consistent and compatible statement of policies." (Gov. Code, § 65300.5.)

The propriety of local decisions affecting land use and development depends on their consistency with the general plan. (*Citizens of Goleta Valley v. Board of Supervisors*, *supra*, 52 Cal.3d at p. 570.) "[A] governing body's conclusion that a particular project is consistent with the relevant general plan carries a strong presumption of regularity that can be overcome only by a showing of abuse of discretion." (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 357.) Courts will find an abuse of discretion if a governing body "did not proceed legally, or if the determination is not supported by findings, or if the findings are not supported by substantial evidence. [Citation.] As for this substantial evidence prong, it has been said that a determination of general plan consistency will be reversed only if, based on the evidence before the local governing body, '. . . a reasonable person could not have reached the same conclusion.' " (*Families Unafraid to Uphold Rural etc. County v. Board of Supervisors* (1998) 62 Cal.App.4th 1332, 1338.)

"Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes. [Citations.] A reviewing court's role 'is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies.' " (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 142.) "Moreover, state law does not require precise conformity of a proposed project with the land use designation for a site, or an

13

exact match between the project and the applicable general plan. [Citations.] Instead, a finding of consistency requires only that the proposed project be '*compatible* with the objectives, policies, general land uses, and programs specified in' the applicable plan. (Gov. Code, § 66473.5, italics added.) The courts have interpreted this provision as requiring that a project be ' "in agreement or harmony with" ' the terms of the applicable plan, not in rigid conformity with every detail thereof." (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 678.) Because the question of substantial compliance with a general plan is one of law, we need not give deference to the conclusion of the trial court on this issue. (*Concerned Citizens of Calaveras County v. Board of Supervisors* (1985) 166 Cal.App.3d 90, 96.)

In this case, the trial court held the Project was inconsistent with the General Plan. The court's focus was on the 199 acres of agricultural open space on the Project site which would be rezoned from A-4 to P-1 to accommodate the Project's cluster development. The court acknowledged the General Plan's discussion of the Magee Ranch special concern area encouraged transferring densities and cluster development on the Project site, but stated: "[I]t is unclear whether such transferring and clustering should (or could) occur on the agricultural-designated portion of the site. . . . So the language of the [special concern area section] can be interpreted reasonably to mean that the non-agricultural portions of the site should be cluster developed, leaving the agricultural portion as open space." The court then held: "The Town, in effect, changed the [General Plan]'s designation and description of agricultural land to add P-1 as a consistent zoning category. And it did so without complying with Measure S—either by putting the issue to a popular vote, or by the Council voting (at least 4/5) to make the change." Even if Measure S did not exist, reasoned the court, the agricultural open space land use designation could not be changed without completing a comprehensive planning study and then amending the General Plan. The court concluded the Town should have first changed the land use designation for the Project site to some other category that expressly allows P-1 zoning.

14

We agree with the trial court that the General Plan's description of agricultural open space, specifically its failure to list P-1 zoning as a consistent zoning district, is problematic for the Town. The General Plan states "zoning districts must correspond with land use map designations." Here, 199 acres of the Project site have been designated agricultural open space, a designation which, according to one section of the General Plan, is consistent with only one type of zoning district: A-2. Yet the Town is trying to rezone the area to P-1 to allow for cluster development. We also agree with the trial court that the General Plan's description of the Magee Ranch special concern area is ambiguous. The General Plan's discussion of the Magee Ranch could reasonably be construed to mean that any cluster development in the area should be concentrated only on land designated as rural residential, which is consistent with P-1 zoning, and not on land designated as agricultural open space, which is not.

However, because the Planning and Zoning Law does not require the Project to be in precise conformity with the General Plan, and since the Town's actions are reviewed under the deferential abuse of discretion standard, we find the trial court's decision was in error. Ultimately, this case turns on the tension between the General Plan's description of agricultural open space and its more specific guidance on the development of the Magee Ranch special concern area. The former ostensibly prohibits P-1 zoning on the 199 acres of agricultural open space on the Project site, while the latter arguably allows it. There are various ways to harmonize these two sections. As we must review the Town's decisions for an abuse of discretion, we need not determine which construction is the most reasonable. Rather, we need only determine whether a reasonable person could agree with the Town's proposed construction. Here, we cannot say that the Town's interpretation of the General Plan is unreasonable.

As an initial matter, we observe the Project effectuates many of the policies described in the General Plan's discussion of the Magee Ranch special concern area. This portion of the General Plan supports retention of the scenic character of the Magee Ranch, encourages development proposals that transfer the allowable number of homes to the least sensitive and obtrusive parts of the site, discourages subdivision of the area into

15

five-acre ranchette sites, and promotes the conservation of open space and the development of wildlife corridors. The administrative record indicates the Project would have minimal impacts on the views from surrounding roads, all homes proposed by the Project would be clustered in flat and unobtrusive portions of the site, and 91 percent of the Project's 410 acres would be preserved as open space, which would include trail connections to other open space areas and preserve wildlife corridors through the site.

Further, the General Plan states, "The Special Concern Areas text . . . identifies land use polices not shown on the Land Use Map or reflected in other parts of the General Plan," suggesting we should defer to the more specific guidance set forth in the special concern area text. Plaintiff argues this statement is irrelevant since nothing in the special concern area section calls for the provisions of that section to overrule other parts of the General Plan. Plaintiff further argues the special concern area policies are akin to a zoning overlay district, which should be applied in addition to more general zoning requirements. Defendants counter plaintiff's position is contradicted by the plain text of the General Plan, including its statement that the development of special concern areas "may result 'in more specific land use designations or policies that are specifically directed at these areas.' " Neither party's position is entirely without merit. Ultimately, the General Plan is ambiguous as to whether the special concern area policies should prevail over or merely augment other General Plan requirements, including those set forth in the land use map. Since we review the Town's decisions for an abuse of discretion, we must defer to its interpretation of the General Plan on this point. (See *Las Virgenes Homeowners Federation, Inc. v. County of Los Angeles* (1986) 177 Cal.App.3d 300, 310 [review of land use map insufficient to determine consistency with general plan where local area wide plan provided extensions and refinement of county wide policy].)

The parties also disagree about whether the General Plan's special concern area guidance actually encourages cluster development on agricultural open space in the Magee Ranch. The guidance states: "The [General] Plan designates a majority of Magee Ranch, including most of the hillside areas, for agricultural use. Application of the Williamson Act to retain these areas for grazing is strongly supported. . . . [N]early half

16

of the site has been designated for rural residential uses, with maximum densities of one unit per five acres. . . . [P]roposals which transfer the allowable number of homes to the least sensitive and obtrusive parts of the site are encouraged. . . . [¶] . . . Despite the A-2 (General Agricultural) zoning on much of the site, subdivision of this Special Concern Area into five-acre 'ranchette' sites . . . is strongly discouraged. . . . On the other hand, transferring allowable densities to a limited number of areas within the ranch would enable the bulk of the site to be set aside as a permanent open space."

Plaintiff focuses on the statement that much of the Magee Ranch has been zoned A-2. Plaintiff argues it is this area that the caution against subdivision into five-acre lots and a preference for clustering is aimed. Plaintiff asserts development on the A-2 land is consistent with the General Plan since this land has been designated rural residential, a land use designation for which P-1 zoning is also allowed. On the other hand, the portion of the Magee Ranch designated as agricultural open space is zoned A-4. Plaintiff contends division of this 199-acre area into five-acre ranchettes would have hardly been expected since the General Plan states these lands should remain under Williamson Act contract.

Defendants counter the General Plan encourages cluster development on agricultural open space within the Magee Ranch, pointing out the text at issue also generally refers to areas designated for agricultural use. Defendants contend the only way to implement the special concern area policies is to develop on agricultural open space since this designation has been applied to all of the flattest, least obtrusive portions of the Magee Ranch. According to defendants, the remainder of the property, including substantially all of the lands designated as rural residential, consists of steeply sloped and environmentally sensitive lands on which the General Plan discourages development. As to the fact that 199 acres of the Project site is zoned A-4, the Town argues this land could be rezoned to A-2 without change to the General Plan since this zoning district is consistent with the agricultural open space designation. Indeed, as defendants point out, the General Plan lists A-2 as the only allowable zoning for land designated as agricultural open space.

17

Again, we find neither plaintiff's nor defendants' interpretation is unreasonable. The text of the General Plan does not expressly state whether cluster development should be limited to those areas of the Magee Ranch that have been designated rural residential. As the trial court acknowledged, the language at issue is ambiguous. The ambiguity appears to be the result of an attempt to satisfy competing interests. The General Plan discourages proposals that would increase the development of the Magee Ranch and supports retention of areas for grazing and agricultural use, but at the same time, it encourages development proposals that would cluster development on flat and unobtrusive areas, almost all of which appear to have been designated agricultural open space. As the case law makes clear, balancing such competing interests is the province of the local governing body. (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors*, *supra*, 87 Cal.App.4th at p. 142.) As the Town's interpretation of the special concern area text is not unreasonable, we decline to second-guess it.

In sum, the General Plan's discussion of the Magee Ranch special concern area suggests defendants are correct and the entire Project site, including the areas designated as agricultural open space, may be cluster developed and zoned P-1. We concede the General Plan is not a model of clarity, and as a result, it is reasonably susceptible to other interpretations. However, as the Town has broad discretion to construe the terms of the General Plan, we need not determine whether an alternative interpretation is more reasonable. Accordingly, we cannot agree with the trial court's determination that the Project is inconsistent with the General Plan, and we reverse the court's judgment in favor of plaintiff on the Planning and Zoning Law claim.

## C. *Plaintiff's Cross-appeal*

Plaintiff's cross-appeal is somewhat convoluted but it appears to concern a disagreement about the maximum development potential for the areas of the Project site previously bound by a Williamson Act contract. Defendants maintain the maximum density allowed in these areas is one unit per five acres, which may be clustered to allow a smaller area of higher density residential development while leaving a larger contiguous area as undeveloped open space. Clustering aside, plaintiff argues the maximum density

18

should be limited to one unit per 20 acres. The trial court found for the Town on this issue. So do we.[7]

The General Plan states that in the event a Williamson Act contract is not renewed, "the underlying zoning density (one unit per 20 acres or one unit per five acres) would apply upon contract expiration." According to defendants, this provision reflects an intent to place property in the position it held prior to the commencement of a Williamson Act contract. Thus, the Town uses the density permitted under the zoning that was in effect before the Williamson Act contract was entered to determine the maximum potential density of a property. In this case, the Town found that, before it was bound by a Williamson Act contract, 199 acres of agricultural land on the Project site was zoned A-2, allowing for densities of up to one unit per five acres. Plaintiff counters the meaning of "underlying zoning density" is the density the current zoning would entail if a Williamson Act contract was not in effect. Since the property was zoned A-4 prior to the termination of the Williamson Act contracts, plaintiff contends the density allowed for the property is one unit per 20 acres, the maximum density permitted under A-4 zoning.

We defer to the Town's interpretation. As discussed in more detail above, the Town's reading of its own General Plan is entitled to a "strong presumption of regularity," and will only be set aside upon a showing of abuse of discretion. (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors*, *supra*, 91 Cal.App.4th at p. 357.) We will not disturb the Town's interpretation, so long as it is reasonable, even if plaintiff's interpretation is more reasonable. (See *Families Unafraid to Uphold Rural etc. County v. Board of Supervisors*, *supra*, 62 Cal.App.4th at p. 1338.) The term "underlying zoning" is ambiguous and thus susceptible to more than one reasonable interpretation. We cannot conclude no reasonable person would agree with

---

[7] As defendants point out, plaintiff's standing to bring a cross-appeal is questionable since the trial court granted plaintiff all the relief it sought. However, plaintiff's cross-appeal can also be construed as an alternative ground for affirming the judgment in its favor on the Planning and Zoning Law claim. If we were to affirm this aspect of the judgment, plaintiff's cross-appeal would be moot. As we reverse, we address the additional arguments raised in plaintiff's cross-appeal.

the Town's assertion that the "underlying zoning" for a Williamson Act property is its previous zoning.

Plaintiff argues the current printed version of the General Plan does not reflect the drafter's intent. Specifically, it contends the reference to "one unit per five acres" was illegally added to the General Plan without public discussion or a vote by the Town's council. The argument is unpersuasive. As an initial matter, the allegedly unauthorized amendments to the General Plan are included in both the formatted version of the plan used today, as well as the unformatted version circulated immediately after the plan's adoption in 1999. Contrary to plaintiff's suggestion, the Town need not prove the current text is consistent with the legislative history. As a matter of law, we must presume the General Plan is valid and that its text reflects the intent of the Town's council. (See Evid. Code, § 664.) The burden is on plaintiff to prove facts establishing its invalidity. (*City of Corona v. Corona etc. Independent* (1953) 115 Cal.App.2d 382, 384.) Plaintiff has fallen far short of meeting its burden here. Its contentions are based on a few ambiguous excerpts from the Town council's summary of actions, in addition to speculation about whether certain proposed revisions to the General Plan were rejected or adopted by the Town's council.[8]

As defendants point out, plaintiff's argument also fails on procedural grounds. Because plaintiff declined to raise this issue during the administrative process, defendants were denied an opportunity to present testimony rebutting plaintiff's allegations of impropriety. Further, this case was brought over a decade after the expiration of the 90-day statute of limitations for actions attacking a legislative body's decision to adopt or

---

[8] To the extent plaintiff is contending the Town's interpretation of the General Plan is inconsistent with the legislative history, its argument also fails. Courts refer to legislative history only where statutory text is ambiguous and its plain meaning does not resolve a question of statutory interpretation. (*Long Beach Police Officers Assn. v. City of Long Beach* (1988) 46 Cal.3d 736, 741.) In this case, we need not look to the legislative history since we must defer to the Town's reasonable interpretation of ambiguous provisions of the General Plan. (See *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors*, *supra*, 87 Cal.App.4th at p. 142.)

amend a general plan (Gov. Code, § 65009, subd. (c)(1)(A)), and plaintiff has yet to point to any authority which would permit the tolling of the statue of limitations.

Plaintiff also contends that, even if the current language of the General Plan was approved by the Town council, it is illogical and self-contradictory. Plaintiff asserts that if, as defendants have argued in the past, A-4 zoning applies only to land currently bound by a Williamson Act contract, then A-4 zoning—and the one-unit-per-20-acre density with which it is associated—would never apply upon the termination of a Williamson Act contract. According to plaintiff, this would render superfluous the reference to "one unit per 20 acres" in the General Plan's statement that " 'the underlying zoning density (one unit per 20 acres or one unit per five acres) would apply upon [Williamson Act] contract expiration.' " But the General Plan indicates A-4 zoning may apply to more than land bound by Williamson Act contract. In fact, it states A-2 is the only zoning consistent with the agricultural open space designation, which is generally used for Williamson Act land. Moreover, since Williamson Act contracts can run for decades (the parcels at issue here were placed under contract over 45 years ago), it is entirely possible that historical zoning districts, other than A-4, required a one-unit-per-20-acre density.

## III. DISPOSITION

The trial court's judgment is affirmed in part and reversed in part. We affirm as to the trial court's finding that defendants violated CEQA by failing to determine whether the Project's impacts on bicycle safety were significant. We also affirm the trial court's determination that "underlying zoning," as that term is used in the General Plan, refers to a property's prior zoning. However, we reverse as to the trial court's determination that defendants violated the Planning and Zoning Law. The parties shall bear their own costs on appeal.

21

_____
Margulies, J.

We concur:


_____
Humes, P.J.


_____
Dondero, J.